Loretta SMITH, Appellant,

v.

UNITED STATES, Appellee.

Nos. 92–CO–1419, 93–CM–789 and 93–CO–1044.

District of Columbia Court of Appeals.

Argued Oct. 27, 1995.

Decided May 30, 1996.

Laura Hankins, Public Defender Service, with whom James W. Klein, Public Defender Service, was on the brief, for appellant.

Lisa A. Hertzer, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Elizabeth Trosman, Gregory E. Jackson, and Cynthia G. Wright, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, C.J., and FARRELL and REID, Associate Judges.

REID, Associate Judge:

This case grows out of an acrimonious relationship between appellant Loretta Smith, and Ms. Cathy Hughes and Mr. Jeffmajors Graham. The acrimony is traceable to a broken personal relationship between Mr. Graham and Ms. Smith, and an existing personal relationship between Mr. Graham and Ms. Hughes. On May 12, 1992, Ms. Smith was charged with one count of malicious destruction of property, in violation of D.C.Code § 22–403 (1989 repl.). She was alleged to have broken flowerpots outside the home of Ms. Ann Fitzgerald, the mother of Mr. Graham. Ms. Smith was acquitted of

the malicious destruction charge on April 14, 1993. However, she was twice convicted of criminal contempt for failure to obey a judicial "stay away" order while she awaited trial on the malicious destruction charge. Ms. Smith appeals both of her contempt convictions. We affirm the first contempt conviction. However, we reverse and remand the second with instructions to vacate the sentence and set aside the order of contempt.

## FACTUAL SUMMARY

On May 12, 1992, a Superior Court Hearing Commissioner conditionally released Ms. Smith on her own recognizance, after her arrest for malicious destruction of property. One of the written conditions of release, imposed at the request of the government, without objection, specified that Ms. Smith was to "stay away" from Mr. Graham, Ms. Hughes and Ms. Fitzgerald. Ms. Smith personally signed the release form which included the "stay away" order. The following statement appeared beside her signature: "I understand the penalties which may be imposed on me for violation of any condition of release and agree to comply with the conditions of my release...." At the top of the release form appeared the words: "You are hereby released on the conditions indicated below: These conditions will be in effect until your case is disposed of or until they are changed or amended by a Judge."

During a status hearing on June 2, 1992, the government advised the court that Ms. Smith "admitted tearing up the garden" [of Ms. Fitzgerald] but "denied damaging a brick wall." Further, the government reported, Ms. Smith had violated the conditions of her release by making several harassing telephone calls. When the government asked the trial court "to issue a stay-away order and no contact with [Mr.] ... Graham and [Ms.] ... Hughes," the trial court retorted: "That order is in effect in any event." Ms. Smith's counsel replied: "The order is in effect and she's abided by it since the day of arraignment." Further, the trial court addressed Ms. Smith directly and said: "In addition, ma'am, you are currently under the Court's order to stay away from and have no contact whatsoever with [Mr.] ... Graham, [Ms.] ... Hughes and [Ms.] ... Fitzgerald. Do you understand that"? Ms. Smith responded, "Yes."

### The First Contempt Incident

On July 2, 1992, Mr. Graham called the police from a pay phone in Maryland and then from his car phone to report that Ms. Smith had followed him, in her car, from a local car wash to a store in Maryland and back to the District of Columbia. He stated that at the intersection of Rhode Island Avenue and Eastern Avenue, Northeast, Ms. Smith had pulled her car alongside his and cursed him. When the police arrived on the scene in Northeast Washington, Ms. Smith sped away. The police chased her to South Dakota Avenue and Bladensburg Road, Northeast before losing sight of her.

Ms. Smith was arrested on July 7, 1992, as a result of an arrest warrant issued on July 3, 1992. On July 17, 1992, the government moved for a contempt hearing. After setting forth a summary of the July 2, 1992, incident, the government asked the trial court to "hold a hearing pursuant to D.C.Code § 23–1329(c) on whether the defendant should be held in contempt of court for violating the conditions of her pretrial release on July 2, 1992." A footnote to the government's motion advised the trial court of additional steps taken to apprise Ms. Smith of the grounds for criminal contempt: "To insure that defense counsel has adequate time to prepare for a hearing on the motion, the government has included with counsel's copy of this motion copies of all discoverable documents regarding the July 2nd incident." These documents included a police officer's summary of the complaint and the arrest, the affidavit in support of an arrest warrant, and a summary of the complainant's report.[1]

---

**1.** A July 30, 1992, status hearing took place on new misdemeanor charges of threats filed against Ms. Smith. These charges were nolled later by the government. The trial court again addressed Ms. Smith directly:

Ma'am, you are under the Court's order to stay away from, in this case, [Mr.] ... Graham. In the other matters you were ordered to stay away from ... Graham, [Ms.] ... Hughes and ... Ms. Fitzgerald. Mr. Graham's

The contempt hearing was held on August 17, 1992. At the beginning of the hearing, the government asked the trial court to take judicial notice of the stay away order dated May 12, 1992. The government specifically stated: "This case involves the violation of that stay-away." Ms. Smith's counsel responded by saying, in part: "I would only clarify that ... she was ordered to stay away from [Mr.] ... Gram (sic) and [Ms.] Fitzgerald ... and [Ms.] ... Hughes.... [T]hose are the three names that are on the stay-away order." In response to counsel's statements, the trial court said: "The Court certainly can take judicial notice of its own Court records and documents. And the order in question is signed by Commissioner Jerry Byrd and is dated May 12th, 1992. And it does indicate that the defendant is to stay away from [Mr.] ... Gram [sic], [Ms.] ... Hughes and ... [Ms.] Fitzgerald." Ms. Smith's counsel replied: "That's correct, Your Honor."

Counsel for Ms. Smith also raised an issue under Super. Ct.Crim. R. 42(b), indicating that "the Court has not issued a show cause order per se to be here—stating the facts why she should not be held in contempt." She went on to "ask ... has the Court made a finding that the application be treated as an Information in this respect, has it met all the elements of the contempt violation"? If not, counsel advised that she "would move to dismiss the application for contempt hearing based on failure to state all essential elements of the cause of action, that being contempt of court." The trial court responded:

> The Court certainly did not issue a written order to show cause. The Court did that verbally on two occasions while the defendant and her counsel were present. The Court indicated that she would hear the motion to adjudicate contempt on this occasion. The Court certainly believes that the application made by the government is appropriate and does meet all necessary requirements. That is the reason the Court is having this hearing today.

mother.... Do you understand that, ma'am? Ms. Smith responded, "Yes." The trial judge added: "You're to have no contact whatsoever

Counsel for Ms. Smith did not take issue with the trial court's statement. He simply said: "Thank you, Your Honor" and proceeded to make his opening statement.

Mr. Graham testified at the hearing and recounted the events of July 2, 1992. He left his home in Northwest Washington around 11 a.m. that day and drove to a Northwest car wash. There he saw Ms. Smith in a green BMW. She walked past him to a telephone while he was waiting for his car to be washed. When he left the car wash, Mr. Graham noticed that he was being followed by a green BMW. He stopped at a natural food store in Maryland, and Ms. Smith pulled her car across the street from the store. Mr. Graham called the police and asked for Detective Dill who was not immediately available. However, Detective Dill soon returned his call and instructed him to alert the local police of the stay away order. By this time, Ms. Smith had parked directly in front of the store, entered the building and positioned herself at arm's length from Mr. Graham while he was on the telephone. The local police told Mr. Graham to return to the District which had jurisdiction over Ms. Smith. When Mr. Graham proceeded to return to the District, Ms. Smith followed him to an intersection in Northeast Washington. When Mr. Graham's car stopped, she pulled abreast of him and said: "[Y]ou, you m_____ f_____, you are not going to get away with trying to make me look like a fool and I'm not going to allow that to happen." Mr. Graham then made a U-turn, and Ms. Smith followed. She again pulled alongside Mr. Graham and stated:

> [Y]ou little m_____ f_____, you're not going to get away with this. That sissy ass United States attorney, ... he's not here and there's no one here to identify ... there's no witness here and this is between me and you and let's see how you're going to get out of this.... I'm going out of town and when I get back before this summer is over, I'm going to f_____ you up.

verbal, by letter or directing others to provide contact. Do you understand me, ma'am"? Again Ms. Smith said, "Yes."

Ms. Smith drove away when the police arrived.

Other witnesses for the government included Detective Dill and two police officers who responded to Mr. Graham's call for assistance. The only witness called for the defense was Mr. Graham.

At the conclusion of the evidence and the closing arguments of counsel, the trial court found Mr. Graham's testimony to be "credible, extremely credible." Ms. Smith was adjudged guilty of contempt because "[she] knowingly and intentionally violated this Court's order, that is, the Court's order which [was] part of her conditions of release to stay away from [Mr.] ... Gram [sic]." Ms. Smith was released on bond pending sentencing for criminal contempt. Before releasing Ms. Smith, the trial court again spoke directly to her: "Ms. Smith, you're still under the Court's order to stay away from and have no contact whatsoever with [Mr. Graham], [Ms.] ... Hughes and [Ms.] ... Fitzgerald, do you understand, ma'am"? Ms. Smith replied, "Yes."

### Revocation of Ms. Smith's Release

Prior to her sentencing on her criminal contempt conviction, other incidents took place which led to the revocation of Ms. Smith's release on October 9, 1992. During the show cause hearing on the revocation of release, Ms. Hughes testified concerning events that took place at a September 27, 1992, Congressional Black Caucus weekend "bruncheon" sponsored by a corporation. As Ms. Hughes left the podium, Ms. Smith got directly in front of her, slowed her pace and began to sway as though imitating a model going down a runway. Later, Ms. Hughes was about to greet an executive of the sponsor corporation when Ms. Smith approached the two "and she screamed out, don't touch her, she has AIDS."

Mr. Graham also testified as to Ms. Smith's encounters with him at the same event, while he was playing the harp in a foyer. Two security officers also testified. One reported seeing Ms. Smith pick up a small knife from a cheese tray, and face Mr. Graham while holding the knife. Eventually security guards had to put protective ropes around Mr. Graham to keep Ms. Smith away. Ms. Smith testified in her own behalf and generally denied the testimony of the government's witnesses. However, she was asked on cross-examination: "And isn't it true that afterward you went up to Mr. Graham who was standing guarding the harp and began speaking to him in an angry tone of voice"? She responded: "I did speak with Mr. Graham.... [but] I wouldn't characterize my behavior toward him as upset." On re-direct examination, Ms. Smith explained her interpretation of the trial court's stay away order:

> I believe that the day that I was found guilty of contempt and they told you that my family had called Mr. Graham, you specifically indicated that I was not to call Mr. Graham, you specifically indicated that I was not to call Mr. Graham, [Ms.] ... Hughes or his mother, I was not to write them, and I was not to go to their homes or their jobs, and I was not to cause any of my relatives or friends to do that either.

At the conclusion of the revocation of release hearing, the trial court credited the testimony of the government's witnesses and found Ms. Smith in intentional violation of the May 12, 1992, stay away order and the trial court's "admonishments" with respect to that order. In revoking Ms. Smith's bond, the trial court stated:

> This Court, Ms. Smith, has made it crystal clear ... what your obligations are. The Court has stated very clearly that you were to have no contact whatsoever with the individuals; that you were not to direct others to have contact with the individuals on your behalf. You have shown the Court that the Court cannot trust you to follow the instructions.

On October 16, 1992, the trial court sentenced Ms. Smith to six months in jail for criminal contempt.

### The Second Contempt Incident

Several days before the scheduled commencement of her April 1993, trial on the malicious destruction of property charge, two events took place which prompted the government to move for another contempt hearing. On March 24, 1993, Ms. Smith telephoned a radio station in which Ms. Hughes

had an ownership interest. She made voice contact only with the office manager of the station, and only uttered a few words before being placed on hold: "Tell Ms. Hughes if she wants to know where I got my money from." Ms. Smith hung up before the office manager returned to the telephone. Two days later, Dalton Howard an attorney who then represented Mr. Graham, who had also represented Ms. Smith in 1988, and who had informally advised Ms. Hughes with respect to her business, received three answering machine messages from Ms. Smith. The thrust of the messages was that *Mr. Graham should cease prosecuting the malicious* destruction case against her because his popularity had declined and attendance at his musical concerts had fallen off.

On March 30, 1993, the government moved for a contempt hearing under D.C.Code § 23–1329(c) (1989) because of these new incidents. Two controversies arose concerning the government's motion. One pertained to whether there was a stay away order referring to third party contacts.[2]

The second controversy concerned whether the government's motion for a contempt hearing referred to one or to two contempts. Judge Duncan–Peters raised this question on May 18, 1993. The government took the position that the efforts to contact Ms. Hughes at her radio station and Mr. Graham through his attorney represented separate counts. Ms. Smith objected on the ground that: "no charging document [was] ever filed that said there were two separate counts." The trial judge heard oral arguments on May 18, 1993, on Ms. Smith's motion for judgment of acquittal. The motion was denied. The trial court also conducted a fairly extensive hearing on May 18 & 19, 1993, during which the issue of one or two contempts was addressed by counsel for both parties; documentary evidence was reviewed and introduced; witnesses were heard; and both counsel presented argument. Ms. Smith was advised as to her right to testify and decided not to do so.

At the end of the hearing the trial court announced its findings and conclusions. The trial court found that Ms. Smith "is an extremely intelligent individual, very articulate, one who in the Court's view has no difficulty understanding court orders, but one who has become involved in a relationship that has been unhealthy for her, by her own admission, as well as unhealthy for others." The trial court stated that:

> the order of [the trial judge] to the defendant on October 9th, 1992 . . . further clarifies the original stay-away order that was issued on May 12th, 1992, . . . [the trial judge] said to the defendant that she was making it crystal clear . . . that she was not to have any contact with these individuals and that she was not to direct others to have contact on her behalf with these individuals.

The trial court concluded that Ms. Smith's call to the radio station was "a *de minimis* violation of the order, that it was prompted by the remarks that were made on the radio."[3] Accordingly, the trial court ruled Ms. Smith not guilty of contempt with respect to her call to the radio station.

However, the trial court concluded that the March 26, 1993, telephone calls to Mr. Howard constituted "a very clear violation of [the trial judge's] order and the stay-away order." The testimony of Mr. Howard was credited, and the trial court noted that: "there was nothing he said to give the defendant the impression that she should contact Mr. Graham. Rather, what he said was that he would make an effort through her attorneys to attempt to get her attorneys together with Mr. Graham." The trial court noted that Ms.

---

**2.** The government relied on Judge Christian's October 9, 1992, words to Ms. Smith: "The Court has stated very clearly that you were to have no contact whatsoever with the individuals, that you were not to direct others to have contact with the individuals in your behalf." The trial court had originally admonished Ms. Smith with respect to third party contacts on July 30, 1992: "You're to have no contact whatsoever verbal, by letter or directing others to provide contact."

**3.** Ms. Hughes had commented on the air that "she was wondering where the stalker got her money to look so good and dress so good." The trial court believed that Ms. Smith understood that "the stalker" referred to her and was calling in response to the implied question.

Smith had called Mr. Howard three different times, and that: "each and every one of these statements is one that is in this Court's view designed to deter Mr. Graham from pursuing the matter, designed to cause him concern about coming down to court and testifying." These statements not only constituted "a violation of the stay away order" but "the combination of these statements together could not be a clearer attempt to persuade a witness through a third party to cease his efforts to have a pending matter resolved in an orderly manner in the court system." On June 14, 1993, the trial court sentenced Ms. Smith to ninety days in jail.

## ANALYSIS

Ms. Smith contends that: (1) there was no valid written release order prohibiting the conduct in which she engaged; (2) a judge's oral instructions may not give rise to a criminal contempt charge; (3) she was not properly charged with criminal contempt in that no information or indictment was filed against her, and the court failed to issue a show cause order and did not exercise its discretionary authority to charge or not charge her with contempt; and (4) with respect to the second contempt, the trial judge erred in relying on information not in evidence to convict her. The government maintains that: (1) Ms. Smith was bound by a valid and enforceable stay away order; (2) the criminal contempt proceedings against her were commenced properly; (3) Ms. Smith either waived any challenge to the absence of an information or indictment, or a show cause order; or the trial court did not commit plain error in proceeding as it did; and (4) with respect to the second contempt, the trial judge did not commit plain error in considering her conduct in the underlying destruction of property trial.

Our review of this case is guided by D.C.Code § 23–1329(c) and Super. Ct.Crim. R. 42(b). D.C.Code § 23–1329(c) provides:

Contempt sanctions may be imposed if, upon a hearing and in accordance with principles applicable to proceedings for criminal contempt, it is established that such person has intentionally violated a condition of his release. Such contempt proceedings shall be expedited and heard by the court without a jury. Any person found guilty of criminal contempt for violation of a condition of release shall be imprisoned for not more than six months, or fined not more than $1,000, or both.

Super. Ct.Crim. R. 42(b) provides:

Disposition upon notice and hearing. A criminal contempt ... shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States Attorney, of the Corporation Counsel, or of an attorney appointed by the Court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. The defendant is entitled to be released on conditions or detained as provided in these Rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the Court shall enter an order fixing the punishment.

■■■■ We begin our analysis of the applicability of these two provisions to Ms. Smith's contempt convictions with the proposition that: "a criminal contempt proceeding is not a criminal prosecution, and consequently not all procedures required in a criminal trial are necessary in a hearing on a charge of contempt." *In re: Wiggins,* 359 A.2d 579, 580 (D.C.1976). Fundamental fairness is the cornerstone of a criminal contempt proceeding in this jurisdiction. *Id.* at 581. What constitutes fundamental fairness is specified in Rule 42(b): a person accused of contempt is entitled to notice of "the essential facts constituting the criminal contempt charged," "a reasonable time for the preparation of the defense," and a hearing. As the United States Supreme Court said in

*Cooke v. United States,* 267 U.S. 517, 537, 45 S.Ct. 390, 395, 69 L.Ed. 767 (1925):

> Due process of law ... in the prosecution of contempt, except that committed in open court, requires that the accused should be advised of the charges and have a reasonable opportunity to meet them by way of defense or explanation.

*See also McCormick v. United States,* 635 A.2d 347, 348 (D.C.1993).

■ Ms. Smith's contention that the contempt charges against her should have been set forth in an information or indictment, or in a show cause order is without merit. The plain words of Rule 42(b) do not require an information or indictment, and in the circumstances of this case the failure to issue a formal show cause order did not invalidate the notice which appellant had. In construing Fed.R.Crim.P. 42(b), which is the same as Super. Ct.Crim. R. 42(b), the Ninth Circuit has concluded:

> Rule 42(b) requires that the notice 'state the essential facts constituting the criminal contempt charged and describe it as such.' The 'simple notice' required by Rule 42(b) is less rigid than the requirements for formal indictment or information, but it must still apprise the defendant of the basis for the contempt charge.

*United States v. Rylander,* 714 F.2d 996, 1004 (9th Cir.1983) (citations omitted). In *Rylander,* the "clearest notice of the charge" was found in "the Government's pretrial brief," not in an information, indictment or show cause order.

So too, Ms. Smith received notice of the first contempt charge through the motion of the government to "hold a hearing pursuant to D.C.Code § 23–1329(c) on whether the defendant should be held in contempt of court for violating the conditions of her pretrial release on July 2, 1992." Attached to the motion, which was served on Ms. Smith, were various documents, including the arrest warrant, a police officer's summary of the complaint and the arrest, an officer's affidavit in support of the arrest warrant, and a sum-

mary of Mr. Graham's complaints. In addition, the body of the government's motion detailed the events of July 2, 1992, with respect to Ms. Smith's pursuit of Mr. Graham that constituted the essential facts of the criminal contempt charged. Based upon these documents, there can be no doubt that Ms. Smith had notice that she was being charged with criminal contempt, and the factual basis of the charge.

Undoubtedly Ms. Smith not only had notice of the stay away order which she violated, but understood that order. Her written conditions of release, with which she agreed to comply, specified that she was to "stay away" from Mr. Graham, Ms. Hughes and Ms. Fitzgerald. The record describes Ms. Smith as "an extremely intelligent individual, [and] very articulate." The record also reflects that she has taught school. Hence, she has no difficulty reading or comprehending the English language. Moreover, on more than one occasion, including June 2, 1992, the trial judge orally explained the stay away order to Ms. Smith in plain English, and she acknowledged her understanding of the order. The trial judge stated: "[M]a'am, you are currently under the Court's order to stay away from and have no contact whatsoever with" Mr. Graham, Ms. Hughes and Ms. Fitzgerald. Thus, Ms. Smith had actual notice as to the behavior prohibited. Hence, the notice requirement clearly was satisfied with respect to the first contempt proceeding. *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 794, 107 S.Ct. 2124, 2130–2131, 95 L.Ed.2d 740 (1987); *United States v. United Mine Workers,* 330 U.S. 258, 297–298, 67 S.Ct. 677, 697–698, 91 L.Ed. 884 (1947); and *H.K. Porter Co. v. National Friction Prods.,* 568 F.2d 24, 26–27 (7th Cir. 1977).

■ Ms. Smith's argument that the trial court had to exercise its discretion to charge or not to charge her with criminal contempt because the government did not charge her in an information or indictment, is equally unpersuasive.[4] She relies on *Young, supra,*

---

4. Ms. Smith raised a question on August 17, 1992, as to whether the government's application would be treated as an "Information." and further inquired about a show cause order. The

trial judge stated that she did not intend to issue a written show cause order because she "did that verbally on two occasions while the defendant and her counsel were present." Further, the

481 U.S. at 801, 107 S.Ct. at 2134–2135 and on the "principle of restraint" which she distills from that case. *Young* simply is not applicable to Ms. Smith's case, either with respect to the first or second contempt charged. At issue there was the validity of the trial court's initiation of the contempt process by appointing a private attorney to prosecute a contempt action. In that context the Supreme Court focused on that part of Fed.R.Crim.P. 42(b) which permits notice of contempt "on application of . . . an attorney appointed by the court for that purpose." In affirming the appointment of an attorney by the trial court, the Supreme Court stated: "[Rule 42(b)'s] assumption that private attorneys may be used to prosecute contempt actions reflects the longstanding acknowledgement that the initiation of contempt proceedings to punish disobedience to court orders is part of the judicial function." *Young, supra,* 481 U.S. at 795, 107 S.Ct. at 2131. Nothing in *Young* states that where the United States Attorney applies for the initiation of the contempt process, the trial judge must exercise its discretion to charge or not to charge contempt. Moreover, there is no question here but that the trial judge independently believed the contempt specifications were warranted.

■■■■ "[I]n order to convict an individual for criminal contempt it is necessary to find beyond a reasonable doubt that the individual committed a volitional act that constitutes contempt." *Parker v. United States,* 373 A.2d 906, 907 (D.C.1977); *see also In re Carter,* 373 A.2d 907, 908 (D.C.1977). Contempt has been defined as "a *willful* disregard or disobedience of a public authority." *Sykes v. United States,* 144 U.S.App. D.C. 53, 55, 444 F.2d 928, 930 (1971). *See also In re Farquhar,* 160 U.S.App. D.C. 295, 298, 492 F.2d 561, 564 (1973). There was ample evidence to find Ms. Smith guilty of the first contempt charge beyond a reasonable doubt. Ms. Smith knew that the stay away order

meant that she was not to approach Mr. Graham, but she intentionally did so on July 2, 1992, at a store in Maryland and on the streets of the District of Columbia when she followed him in her car, and had voice contact with him more than once that day. Only one month before this incident, the trial judge admonished Ms. Smith that the May 12, 1992, order required her to stay away from and have no contact with Mr. Graham. Nonetheless, "the evidence shows that by . . . her conduct . . . [Ms. Smith] 'overstep[ped] the bounds of propriety and refuse[d] to heed the admonitions of the court or' . . . 'a lawful order of the court'. . . ." *Bethard v. District of Columbia,* 650 A.2d 651, 653 (D.C.1994). The trial judge found Mr. Graham to be "extremely credible," and his testimony was corroborated by that of other witnesses. Ms. Smith willfully disobeyed the May 12, 1992, order of the trial court, and showed disrespect for the trial court. Consequently, the trial court adjudged Ms. Smith guilty of criminal contempt, and sentenced her to six months in jail. "In light of the surrounding circumstances," we see no error by the trial court and hence affirm her conviction with respect to the first contempt charge. *Id.* at 653.

The government initiated the second contempt charge by filing a motion with the trial court to "hold a hearing at which the defendant would be required to show cause why she should not be held in contempt of court for violating her pretrial release." The government's motion outlined two incidents which served as the factual basis for the contempt charge. One incident related to a telephone call by Ms. Smith to radio station WOL in which Ms. Hughes has an ownership interest; and the second concerned telephone calls from Ms. Smith to Dalton Howard, an attorney who represented Mr. Graham, who had represented Ms. Smith in 1988, and who had done some legal work in connection with

trial judge stated that: "the application made by the government is appropriate and does meet all necessary requirements." Counsel for Ms. Smith did not object to the trial judge's conclusions. Rather, counsel stated: "Thank you, your Honor," and proceeded with the defense's opening statement. Moreover, Ms. Smith did not file a motion to dismiss on the basis that she had not

been charged with criminal contempt in an information or an indictment, or no show cause order had been issued by the trial court. Accordingly, we review the trial court's rulings only for plain error that "affect[s] substantial rights." *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993).

Ms. Hughes' business. The incident relating to the call to WOL is not before us since Ms. Smith was found not guilty of that charge.

■ With regard to the call to Mr. Howard, the threshold issue is whether Ms. Smith had notice that the conduct prohibited extended to contact with the witnesses through counsel. The government relies on the May 12, 1992, written order regarding Ms. Smith's conditions of release pending trial, which included the order to stay away from Mr. Graham, Ms. Hughes and Ms. Fitzgerald, as well as the trial judge's words to Ms. Smith during a July 30, 1992, status hearing: "You're to have no contact whatsoever verbal, by letter or directing others to provide contact. Do you understand me, ma'am"? Ms. Smith insists that any order to stay away from third parties had to be in writing, as prescribed by D.C.Code § 23–1321 and D.C.Code § 23–1322(f). We agree.

D.C.Code § 23–1321(a)(2) permits a judicial officer to release a defendant, pending trial, on certain conditions.[5] D.C.Code § 23–1322(f)(1) specifies that:

> In a release order issued under § 23–1321 ... (c), the judicial officer shall: (1) Include a written statement that sets forth all the conditions to which the release is subject, in a manner sufficiently clear and specific to serve as a guide for the person's conduct;
>
> . . . .

The plain words of § 23–1322(f)(1) require a written statement of conditions. The only written statement of conditions issued in Ms. Smith's case is that of May 12, 1992, which does not command her to stay away from third parties associated with Mr. Graham, Ms. Hughes or Ms. Fitzgerald.

Moreover, assuming, without deciding, that the trial judge's July 30, 1992, oral instruction to Ms. Smith could be considered a proper "statement" under § 23–1322(f)(1), it must be "sufficiently clear and specific to serve as a guide for the person's conduct." The trial judge's oral instruction regarding third parties was general: "You're to have no contact whatsoever verbal, by letter or directing others to provide contact." We cannot say that Ms. Smith could reasonably infer from these words that she was not to have contact with Mr. Graham's attorney, who was attempting to resolve the problem among Ms. Smith, Ms. Hughes and Mr. Graham. Indeed, at her October 9, 1992, revocation of release hearing, Ms. Smith explained her understanding of the trial court's stay away order in response to a re-direct examination question:

> I believe that the day that I was found guilty of contempt and they told you that my family had called Mr. Graham, you specifically indicated that I was not to call Mr. Graham, [Ms.] ... Hughes or his mother, I was not to write them, and I was not to go to their homes or their jobs, and I was not to cause any of my relatives or friends to do that either.

While Ms. Smith understood that she was to have no contact with Mr. Graham, Ms. Hughes or Ms. Fitzgerald, even through her "relatives or friends," she did not anticipate that the trial court's instruction covered contact through Mr. Graham's attorney. Nor can we conclude that Ms. Smith could reasonably infer that the instruction covered such contact.[6] Accordingly, we are con-

---

**5.** D.C.Code § 23–1321(a)(2) provides that:

Upon the appearance before a judicial officer of a person charged with an offense, other than murder in the first degree or assault with intent to kill while armed, ... the judicial officer shall issue an order that, pending trial, the person be: ...
(2) Released on a condition or combination of conditions under subsection (c) of this section.
D.C.Code § 23–1321(c)(1)(B)(v) provides that:
If the judicial officer determines that the release ... will endanger the safety of any other person or the community, the judicial officer shall order the pretrial release of the person subject to the:

(B) Least restrictive further condition, or combination of conditions, that the judicial officer determines will reasonably assure ... the safety of any other person and the community, which may include the condition or combination of conditions that the person during the period of release shall: (v) Avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense; ....

**6.** In the context of domestic stay away orders, the trial court recognizes the importance of third parties in facilitating communication between the principals. This is particularly true of attorneys. *See* MANUAL ON INTRA FAMILY CASES

strained to hold that Ms. Smith never received notice under Super. Ct.Crim. R. 42(b) or D.C.Code § 23–1322(f) that she was required to refrain from having indirect contact with Mr. Graham through his attorney, Dalton Howard, as a condition of her pretrial release. Given this holding, we do not reach Ms. Smith's contention that the trial judge relied on information not in evidence in finding her guilty of one aspect of the second contempt charge.

Accordingly, we affirm Ms. Smith's first contempt conviction (92–CO–1419), and reverse and remand the second (93–CM–789) with instructions to vacate the sentence and set aside the order of contempt. Appeal no. 93–CO–1044 is dismissed as moot.

*So ordered.*

FOR D.C. SUPERIOR COURT JUDGES, 52 (Orloff 1993).