Jesse C. BAKER, Appellant,

v.

UNITED STATES, Appellee.

No. 04–CF–260.

District of Columbia Court of Appeals.

Argued Sept. 20, 2005.

Decided Jan. 26, 2006.*

* The court has granted appellee's consent motion to amend the opinion filed January 26, 2006.

Patrick T. Hand, appointed by the court, Washington, for appellant.

Thomas S. Rees, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Elizabeth Trosman, Roy Austin, and Jeannie Rhee, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and REID, Associate Judges, and KING, Senior Judge.

KING, Senior Judge:

Jesse C. Baker was charged with stalking, threatening to injure a person, assault, obstructing justice, criminal contempt, and two counts of destroying property. Following a jury trial, Baker was acquitted of assault, but convicted on the remaining counts. He now appeals claiming that his convictions for criminal contempt and destruction of property should be reversed. We affirm.

## I.

Baker had a romantic relationship with complainant Inti Boggs. Shortly after the couple began dating in May 2001, Baker and Boggs started living together at Boggs' home in Laurel, Maryland. Baker was physically abusive throughout the relationship and Boggs filed several reports detailing that abuse with Maryland police. Although Boggs left Baker a number of times, the two eventually would reconcile. By August 2003, the relationship had soured beyond repair.

On August 20, 2003, Baker began sending threatening messages to Boggs on her cellular phone, calling her between six and twelve times that day. Each message became increasingly more threatening. Boggs played the messages to a co-worker at Ozio's Cigar Bar and Lounge, located at 1813 M Street, N.W., which included statements that Baker knew where to find Boggs and that he planned to kill her. Later that evening, Boggs played the same message for Officer Anthony Baker, a member of the Metropolitan Police Department (MPD). On that same date, Boggs' manager, Frank Vinueza, noticed Baker drive past the establishment approximately twenty times during the evening.[1]

Based on the threatening messages from Baker, MPD Detective Williams contacted Boggs and requested that she press charges, but she indicated that she did not wish to do so. Detective Williams then informed her that she would need to complete paperwork at the station whether she pressed charges or not. While Boggs was on her way to the station, Baker phoned her, instructing her to "undo" whatever she had done, or he would "make [her] life a living hell." That same afternoon, Vinueza discovered obscene and slanderous phrases regarding Boggs that had been spray-painted across the exterior walls of 1813 M Street, the lettering extending to the building next door.[2] At trial, Boggs identified the spray-painted lettering as Baker's distinctive handwriting.

On August 22, 2003, a day when Boggs was not working, Ozio's security staff noticed Baker inside the bathroom of the restaurant and they asked him to leave. He refused. The security staff restrained Baker until the police arrived[3] and placed him under arrest. After he was arrested, a black marker pen was removed from his pocket. A staff member returned to the bathroom and discovered language, similar to that which had been spray painted on the bar's exterior walls, written in two places in the bathroom.[4] On August 25,

---

1. Concerned that Baker might discover her place of work and attempt to harass her there, Boggs had shown some of her co-workers a photograph of Baker.

2. Vinueza removed some of the writing with graffiti remover and wire brushes. However, he was unable to find an exact match to the original paint, consequently the result looked "patchy."

3. During this encounter, Baker attempted to punch Vinueza, forming the basis for the assault charge.

4. No charges were filed against Baker at that time and he was released the following day.

Boggs sought a restraining order against Baker in the District Court of Prince George's County, Maryland and the court issued a stay-away order.

Sometime during the morning of August 29, Boggs filed threats charges in the District of Columbia against Baker. That evening while Boggs was at work, Vinueza noticed Baker's white Lexus drive by the restaurant. Later, an employee saw Baker go into the nearby garage where Boggs had parked her car. Police were summoned, and they discovered Baker inside the garage holding a can of spray paint. The officers found obscene and slanderous phrases written in black spray paint all over Boggs' vehicle.[5]

On August 30, 2003, Baker was charged in the District with threatening to injure/kidnap persons in violation of D.C.Code § 22–1810 (2001).[6] On September 2, an amended complaint was filed, charging Baker with destruction of property in excess of $200.[7] At that time, the government dismissed the felony threats charge. The trial court then conducted a pre-trial detention hearing, and held Baker without bond. At the government's request, the trial court preventively detained Baker under D.C.Code § 23–1322(b)(1)(C) and orally ordered Baker "to have no contact whatsoever directly or indirectly" with Boggs. Subsequently a ten-count indictment was returned, which included a contempt charge, based on Baker's asserted

violation of this order for sending letters to Boggs while he was incarcerated.[8]

Cell phone records admitted into evidence showed that Baker had called Boggs' cellular phone or home telephone a number of times between August 18 and August 30. While incarcerated, Baker also wrote Boggs several letters. Four of those letters were admitted into evidence, which Boggs identified as being in Baker's handwriting. These letters were the basis for the criminal contempt charge.

At the close of evidence during the trial, the court questioned whether the contempt instruction should contain language that Baker's disobedience of the court's order must have caused an obstruction to the orderly administration of justice. Defense counsel argued that *In re Gorfkle,* 444 A.2d 934 (D.C.1982), controlled and requested that the jury instructions contain language stating that Baker must have committed a willful act that "show[ed] disrespect for the court or to disrupt its proceedings." The trial court ruled, however, that *Grant v. United States,* 734 A.2d 174 (D.C.1999), was more apposite, distinguishing between a disruption or interference committed in the presence of the court as was the case in *Gorfkle,* and disobedience of a court order outside the presence of the court which occurred in *Grant.* Although the trial court noted that *Grant* did not perfectly apply to the instant circumstances, it determined the principles set forth in *Grant* could be ex-

---

**5.** The parties stipulated the cost of repairs to the vehicle totaled $1,305.40.

**6.** All references to the District of Columbia Code are to the 2001 Edition unless otherwise noted.

**7.** *See* D.C.Code § 22–303.

**8.** The December 8 indictment charged Baker with (1) stalking, in violation of D.C.Code § 22–404(b); (2) threatening to injure a person, in violation of D.C.Code § 22–1810; (3)

assault, in violation of D.C.Code § 22–404; (4) obstructing justice, in violation of D.C.Code § 22–722(a); (5) destroying property in the amount of $200 or more, in violation of D.C.Code § 22–303 (spray painting the exterior walls of Ozio's); (6) destroying property in the amount of $200 or more, in violation of D.C.Code § 22–303 (spray painting the exterior of Boggs' vehicle); and (7) criminal contempt, in violation of D.C.Code § 11–944(a).

trapolated to Baker's case.[9] Defense counsel did not object, but later moved for judgment of acquittal on the basis that the letters were not "contemptuous." The trial court denied the motion and Baker was convicted of stalking, threats, contempt, and both counts of destruction of property. In this appeal, he only challenges the convictions for contempt and destruction of property.

## II.

In challenging the conviction for criminal contempt, Baker sets forth three grounds for reversal. First, Baker contends that once the trial court ordered him preventively detained, it lacked authority to issue a no-contact order because such orders are authorized by the pretrial release statute[10] only as a condition of release. The government responds that Baker failed to raise a timely challenge to the validity of the order and contends that Baker should have sought a stay and appealed its issuance. The government also argues that the trial court's "inherent power" over pretrial detention and release, predating the District's bail reform stat-

ute, authorized the trial court to issue the no-contact order in this case. We need not decide whether the order was validly issued under the bail statute, or whether the trial court possessed inherent authority,[11] to issue the no-contact order because: (1) Baker did not challenge or appeal the order below;[12] and (2) the trial court's no-contact order was not patently unauthorized under *In re (Iris) Banks*, 306 A.2d 270 (D.C.1973).

 Compliance with court orders is required until they are reversed on appeal or are later modified. *Kammerman v. Kammerman*, 543 A.2d 794, 798–99 (D.C. 1988). Court orders must be respected and "disobedience of them is contempt of its lawful authority, to be punished." *Howat v. Kansas*, 258 U.S. 181, 190, 42 S.Ct. 277, 66 L.Ed. 550 (1922). Thus, even assuming for the sake of argument that the trial court's no-contact order was invalid, Baker's conviction for contempt must be upheld for his failure to comply with that order. *See In re (Simon) Banks*, 805 A.2d 990, 1001–02 (D.C.2002); *In re Marshall*, 445 A.2d 5, 7 (D.C.1982); *Walker v. City of*

---

**9.** After the trial concluded, the trial court again raised the issue of whether the jury instruction should have included the language "affecting the orderly administration of justice" and requested memoranda from both parties. The trial court again agreed with the government's argument that the letters themselves were violations of the no-contact order under *Grant*, and therefore the disputed language was properly omitted from the instruction.

**10.** D.C.Code § 23–1321(c)(1)(B) governs pretrial release and provides that a judicial officer may condition a defendant's release so as to ensure the safety of certain persons and the community. It provides that the court may direct that the defendant "during the period of *release* shall: . . .
 (v) Avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense."

D.C.Code § 23–1321(c)(1)(B)(v) (emphasis supplied).

**11.** Although this case does not oblige us to resolve the issue, the notion that the statutory authority to detain on grounds of dangerousness does not include the power to order a detainee to avoid indirect contact—say, through telephone calls—with a person or persons to whom he presents a potential danger is decidedly counter-intuitive. *Cf. Oliver v. United States*, 682 A.2d 186 (D.C.1986) (reaffirming, in context of pretrial release, court's power "to order a party to take action not specifically prescribed by statute").

**12.** Although defense counsel argued that his client should not be detained, he never questioned the trial court's authority to issue the stay-away order as recommended by the government.

*Birmingham,* 388 U.S. 307, 320–21, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967).

Here, the record demonstrates that Baker contacted Boggs several times even after a Maryland court issued a stay-away order.[13] Concerned for the safety of the complainant, the trial judge here denied bail and ordered Baker "to have no contact directly or indirectly" with Boggs. Baker neither objected to that order nor requested a stay or challenged the validity of the order in any way once it was issued. Without such a challenge, Baker's refusal to obey the no-contact order was undertaken at his own peril. *See also In re Evans,* 411 A.2d 984, 993 n. 10 (D.C.1980) (appellant could be prosecuted for contempt when he failed to pay a $500 court-ordered fine, even though the statute authorized a maximum fine of $300). Consequently, this claim fails.

Nor can Baker's conviction for criminal contempt be challenged on the ground that the no-contact order was patently unauthorized under *(Iris) Banks, supra,* 306 A.2d at 274. In *Banks,* the trial court judge ordered a juvenile to remain in the temporary custody of social worker Banks, rather than detain the individual until suitable custodians were located. *Id.* at 272. The social worker immediately objected, refusing to take custody of the juvenile after the trial judge was asked but declined to reconsider his order. As a consequence, the trial court adjudged Banks in criminal contempt and sentenced her to serve eight hours in the custody of the United States Marshals.[14] On appeal, we held that since Banks could in no way be considered a "custodian" under the relevant statute,[15] the trial court lacked the authority to punish a violation of its order which it had rendered without jurisdiction. *Id.* at 273–74. Consequently, we concluded that Banks' refusal to obey a court order would not be punishable by criminal contempt because it was patently unauthorized. We cautioned, however, that "it is no light matter to defy an order of the court" and one who does so risks a criminal contempt charge in most circumstances. *Id.* at 274.

The exceptional circumstances of *Banks* are not present here. The trial court's stay-away order did not impose the same type of burden or hardship as the order issued in *Banks.* In *Banks,* the trial judge ordered a social worker to assume full responsibility and care of a teenager with "behavior problem[s]" for three days. *Id.* at 271–72. In contrast, the trial court here, knowing that the Maryland stay-away order would soon expire, simply directed that Baker have no contact with Boggs. By doing so, the court essentially ordered Baker to refrain from engaging in further criminal activity. Given these circumstances, we cannot say that the trial court's order was patently unauthorized, and thus Baker's subsequent disobedience of the order does not escape punishment because of our holding in *Banks.*

Baker next contends that he was not afforded the requisite notice about the criminal contempt charge. In so arguing

---

13. The Maryland stay-away order is not part of the record; therefore, we do not know exactly what language the court used. Baker does not contest, however, that the Maryland court order directed him to avoid contact with Boggs.

14. The trial court allowed for a stay to note an appeal. *Id.*

15. The code defined a custodian as "a person or agency other than a parent or legal guardian, to whom legal custody of a child has been given by court order and who is acting in loco parentis." D.C.Code § 16–2301(12) (1972 Supp.). This court determined that simply labeling Banks a "competent custodian" in a contempt order did not "transform" her into a custodian under the statute. *Id.* at 273–74.

Baker relies on Super. Ct.Crim. R. 42(b), which provides that "criminal contempt shall be prosecuted on notice [to include] the time and place of hearing ... and shall state the essential facts constituting the criminal contempt charge." We are satisfied that the notice requirement is more than met by the filing of the indictment. First, the purpose of an indictment is to apprise the accused of the charges against him, so that he may adequately prepare his defense. *Gaither v. United States*, 134 U.S.App. D.C. 154, 159, 413 F.2d 1061, 1066 (1969). Second, in *Smith v. United States*, 677 A.2d 1022, 1028–30 (D.C.1996), we held that the plain words of Rule 42(b) do not require that an indictment be filed. It follows that, although a formal indictment is not necessary to satisfy the notice requirement of Rule 42, an actual indictment would in fact suffice. The record shows that the October 29 indictment included the criminal contempt charge and the events giving rise to that charge. A status conference was then set for December 2, affording Baker ample time to prepare a defense. Thus, his contention of insufficient notice must be rejected.

■ In a related argument, Baker suggests that the trial court's order lacked specificity and that there was insufficient evidence to support his conviction for criminal contempt. Viewing the evidence in the light most favorable to the government as we must, *see Gayden v. United States*, 584 A.2d 578, 580 (D.C.1990), *cert. denied*, 502 U.S. 843, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991), and drawing all inferences of fact in its favor, we will affirm unless Baker establishes the trial court's findings are "plainly wrong" or without evidentiary basis. *Mihas v. United States*, 618 A.2d 197, 200 (D.C.1992). The record demon-

strates that Baker responded "yes" when asked if he understood the court's order to "stay completely away from this woman ... while the case is pending, you are to have no contact whatsoever directly or indirectly" with the complainant. We are satisfied in these circumstances that the jury could readily conclude that Baker understood that his campaign of letter-writing violated the court's prohibition. Finally, there is nothing unusual or ambiguous about this prohibition.[16] For these reasons we conclude there was sufficient evidence to support Baker's convictions for criminal contempt. *See In re Richardson*, 759 A.2d 649, 654 (D.C.2000).

Finally, Baker contends that the trial court erred when it failed to instruct the jury that it must find that his actions "obstructed the orderly administration of justice." Baker argues the trial court erroneously relied on *Grant* when it decided not to include that language in the instruction. *Grant v. United States*, 734 A.2d 174, 176 (D.C.1999). We disagree.

■ In *Grant*, this court affirmed the appellant's criminal contempt conviction for failing to refrain from drug use, a condition of his pretrial release, based on a showing of "willful disobedience." *See* D.C.Code § 23–1329 (1999 Supp.). In so holding, the court rejected Grant's argument that a conviction for criminal contempt, for disobedience of a court order, required proof that the disobedient act caused an obstruction of the orderly administration of justice. *Grant, supra*, 734 A.2d at 176. In *Grant*, however, we did not address the proof requirements for a court's use of the general criminal contempt statute, D.C.Code § 11–944(a), rather than the more particular statute appli-

16. *See Smith, supra*, 677 A.2d at 1028 (where the trial court instructed the defendant to stay away from the complainant, appellant could not reasonably infer from the order that she was refrained from contacting complainant's counsel).

cable to pretrial release. *Id.* at 177. We do so now, and accordingly hold that the elements of criminal contempt in these circumstances may be satisfied upon a showing of: (1) conduct committed in the presence of the court that disrupts the orderly administration of justice; or (2) *willful disobedience of a court order, committed outside the presence of the court. See id.* at 176–77. *Accord People v. Totten,* 118 Ill.2d 124, 113 Ill.Dec. 47, 514 N.E.2d 959, 965 (1987) (affirming conviction of indirect criminal contempt for the violation of a court order committed outside the presence of the court, based on proof of: (i) the existence of a court order, and (ii) a willful violation of that order); *Commonwealth v. Pace,* 15 S.W.3d 393, 395 (Ky.Ct.App.2000) (stating evidence of criminal contempt must demonstrate a willful disobedience toward, or open disrespect for, the rule or orders of a court); *Furtado v. Furtado,* 380 Mass. 137, 402 N.E.2d 1024, 1032–33 (1980) (holding a charge of criminal contempt must include allegations that there was a clear, outstanding order of the court, that the defendant knew of that order, and that the defendant intentionally disobeyed that order where circumstances demonstrated he was able to obey it). Baker's act of sending letters to Boggs after he acknowledged that he understood the court's order that he not have direct or indirect contact with her plainly qualifies as an act of "willful disobedience." *See Grant, supra,* 734 A.2d at 177. Thus, the trial court properly instructed the jury on the elements of criminal contempt.

## III.

■ Finally, Baker contends there was insufficient evidence to support his convic-

tions for felony destruction of property for damaging Boggs' vehicle and misdemeanor destruction of property for damaging the exterior walls of Ozio's Cigar Bar and Lounge.[17] To show felony malicious destruction of property, the government must show (1) malicious injury (2) to an item not his or her own and (3) the damage sustained totaled more than $200. The elememts of misdemeanor destruction are identical to those of its felony counterpart, but involve damage totaling less than $200. D.C.Code § 22–303. Although this court has not yet had occasion to define "injures, breaks, or destroys" within the context of D.C.Code § 22–303, the record demonstrates sufficient proof of injury and the amount of damages.

■ First, the record clearly shows the damage to complainant's vehicle totaled over $1300. Second, using black spray paint to inscribe obscenities on walls and on an automobile causes damage sufficient under the statute. "Injury" is defined as "detriment to, or violation of, person, character, feelings, rights, property, or interests, or value of the thing." WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed.1947). Applying this definition to the facts here demonstrates that the graffiti, although temporary, caused sufficient "injury." In order to repair Boggs' vehicle, the paint had to be removed and then replaced with a new layer of paint, otherwise, the vehicle would have been significantly devalued. Thus, the government presented significantly more than sufficient proof of the malicious destruction of Boggs' vehicle.

■ The government also presented sufficient proof of misdemeanor destruc-

---

17. In a related argument, Baker contends that he should have been charged with defacing property under D.C.Code § 22–3312.01. The choice to charge one offense over another is a matter of prosecutorial discretion rarely reviewed by this court. *Marrow v. United States,* 592 A.2d 1042, 1047 (D.C.1991). We see no reason to do so now.

tion of property. Here, the record demonstrates that Vineuza spent considerable time and $36 on graffiti removal supplies. The nature of the injury—obscene phrases written in dark paint across light-colored walls—made it difficult to restore the building to its original appearance. Thus, although no part of the wall had to be removed or replaced, as was the case with Boggs' vehicle, the splotchy appearance resulting from the painting-over the graffiti necessarily caused a decrease in the building's value. *People v. Sokoloski,* 1997 WL 33354356, 2, 1997 Mich.App. LEXIS 454, 3–4 (Mich.Ct.App.1997) (where evidence demonstrated that the defendant spray-painted the word "slut" on his ex-girlfriend's truck, the jury could have concluded beyond a reasonable doubt that defendant maliciously caused over $100 damage to the pick-up and that defendant specifically intended to cause the damage). Therefore, we conclude there was sufficient proof of "injury" under the statute to affirm Baker's misdemeanor conviction.

Accordingly, for the foregoing reasons, the judgment is

*Affirmed.*