**David B. JOHNSON and Derrick G. Lewis, Jr., Appellants**

v.

**UNITED STATES, Appellee**

No. 98–CF–1835, 99–CF–27.

District of Columbia Court of Appeals.

Argued March 2, 2004.

Decided Sept. 22, 2005.

Sept. 23, 2005.

Michael L. Spekter, Washington, appointed by the court, for appellant Johnson.

Kenneth D. Auerbach, Silver Spring, MD, appointed by the court, for appellant Lewis.

Thomas S. Rees, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., and Michael T. Ambrosino, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, FARRELL, and RUIZ, Associate Judges.

TERRY, Associate Judge:

Appellants Johnson and Lewis were indicted for armed carjacking, armed kidnapping, attempted robbery while armed, three counts of first-degree felony murder

while armed, one count of first-degree premeditated murder while armed, unauthorized use of a vehicle, possession of a firearm during a crime of violence, carrying a pistol without a license, and two counts of destruction of property. They were found guilty of first-degree felony murder while armed based on the armed kidnapping, guilty of first-degree felony murder while armed based on the armed attempted robbery, guilty of second-degree murder while armed (as a lesser included offense under the felony murder count based on the armed carjacking), guilty of first-degree premeditated murder while armed, and guilty as charged on all the other counts.[1]

Appellants challenge their convictions on several grounds. We agree that each appellant's four murder convictions—two for felony murder, one for premeditated murder, and one for second-degree murder, all "while armed"—merge with one another, since there was only one victim. *See Thacker v. United States*, 599 A.2d 52, 63 (D.C.1991). We also conclude that each appellant's two destruction of property convictions must merge into one because they are both based on the same event. *See Carter v. United States*, 531 A.2d 956, 964 (D.C.1987). The sentences of both appellants must therefore be modified as set forth in part IV of this opinion, and for that limited purpose we remand. In all other respects, we affirm.[2]

I

Briefly summarized, the evidence showed that during the early morning hours of August 22, 1997, appellants carjacked and kidnapped Damari Thomas; then, after stabbing and cutting him ap-

proximately twelve times, they killed him by shooting him twice in the head. Hearing the gunshots, a police officer in a patrol car spotted the carjacked Cadillac and promptly gave chase. The high-speed pursuit ended when the Cadillac crashed into a United States Postal Service truck at the intersection of Georgia Avenue and Irving Street, N.W. Lewis was apprehended almost immediately thereafter by police officers who pursued him on foot. Johnson was found with the assistance of a police dog about twenty minutes after the crash, hiding in dense shrubbery.

On August 21 Antoine Richards left his 1990 blue Cadillac Sedan DeVille in the care of his friend, nineteen-year-old Damari Thomas, while he went on vacation. Later that evening, Thomas drove the Cadillac to the Metro Club to hear a musical group called the Backyard Band. During an intermission at the club, Thomas had a drink with Ralph Glover, a rapper with the band. Glover noticed that as Thomas was paying for the drinks, he flashed "a lot of money." Also at the Metro Club that night were appellants David Johnson and Derrick Lewis.

After the performance ended at 2:00 a.m., Thomas gave Glover and Akito McMillan, another acquaintance, a ride home in the Cadillac to the 700 block of Hobart Street, N.W. A number of people were hanging out on the street there, including Johnson and Lewis. Glover got out of the car, bought some marijuana, and headed toward his home, leaving Thomas and McMillan standing next to the Cadillac.

About twenty minutes later, seventeen-year-old Tyronica Watson, a friend of

---

1. In other words, each appellant was found guilty on twelve counts, including four counts of murder.

2. We do not reach appellant Johnson's claims of ineffective assistance of counsel, for reasons stated in part V of this opinion.

Lewis who lived in the same block, heard someone struggling outside her house. She also heard a man whose voice she did not recognize say, "Get off me." As she opened her front door to investigate, she saw Lewis force a man into the back seat of a Cadillac; that man was wearing a black shirt, but his face was obscured from view. Lewis was still standing next to the Cadillac when the driver addressed Lewis by name and told him to get into the car. Lewis then entered the Cadillac and sat in the back seat behind the driver. The apparently abducted man was in the middle of the back seat "bent over," and a third man was seated on the right side of the back seat as the Cadillac drove away. Ms. Watson, mistakenly believing that the abducted man was her uncle, Rodney McDaniels, ran back into her house, screaming that her uncle had been kidnapped. Another family member immediately called the police.

Sometime between 2:00 and 3:00 a.m., Rachel Corbie, was in the living room of her home on Shepherd Street, N.W., "trying to rock [her] son to sleep because he was crying," when she heard a gunshot. Through her front window, she saw a blue Cadillac creep toward the middle of the block and thought that this was the same Cadillac that she had seen Thomas driving the previous afternoon. However, seated in the Cadillac were two men whom she did not recognize: the driver and a man in the back seat with braided hair. Another man, who was standing on the far side of the street, fired a silver gun toward the ground.[3] The man with the gun then entered the Cadillac on the right side, and the car drove off. Ms. Corbie then called the police, went back outside, and found a man lying on the ground, bleeding. She did not talk to the police that night because she "did not want to get involved,"

but she later learned that the man she saw on the ground was Damari Thomas.

Gilbert Arnett, who was also in his home on Shepherd Street, heard the gunshots as well. After the first shot, which woke him up, he looked out the window and saw a blue Cadillac. He also heard someone yell something indiscernible like "Aw." Arnett then heard a second gunshot and decided to investigate. After getting dressed, he went outside and saw Ms. Corbie, who was "hysterical, screaming, crying." He also saw Damari Thomas lying face down on the sidewalk in front of the house next door. "He wasn't moving, and blood was coming out of his head." He appeared to be dead. The Cadillac was nowhere to be seen.

Officer Juan Burford was the first police officer to arrive on the scene. He found Thomas lying face down on the ground in front of 916 Shepherd Street, with what appeared to be gunshot wounds to the head. There was a trail of blood between the front porch of the house at that address and the place where Thomas lay. Thomas' clothes were soaked with blood, and his pants pockets had been pulled inside out.

Sergeant Gerry Scott of the Metropolitan Police also heard a gunshot while driving south on nearby Georgia Avenue. He quickly turned his car toward the source of that gunshot. As he headed in that direction, he heard a second shot and saw someone jump into the passenger side of a Cadillac in the 900 block of Shepherd Street. Sergeant Scott activated his emergency lights and chased the Cadillac, along with other police officers, for several minutes at speeds in excess of sixty miles per hour.

3. Neither Johnson nor Lewis had a license to    carry a pistol in the District of Columbia.

The car chase ended when the Cadillac crashed into a Postal Service truck at the corner of Georgia Avenue and Irving Street. This crash caused $3,000 worth of damage to the postal truck and totaled the Cadillac. After the crash, the three occupants of the Cadillac jumped out and fled on foot. Lewis, who had been in the front passenger seat, ran down an alley, reversed course, and was promptly detained by Officer David Brock. Johnson, who was sitting in the back seat of the Cadillac, was found about twenty minutes later, with the aid of a police dog, hiding in some shrubbery near an alley. The driver was never caught or identified, but other evidence indicated that he might have been Akito McMillan. An identification card bearing Johnson's name was later found on the back seat of the Cadillac, and a bloody plastic bag with Johnson's fingerprint on it was recovered from the floor under the driver's seat.

Dr. Gertrude Hjaardemal, a deputy medical examiner, testified that Thomas died of two gunshot wounds to the head. The shots were fired in quick succession, and one of them came from a distance of eighteen inches or less. The superficial stab wounds found on Thomas' body were inflicted before the fatal shots, most likely while he was in the back seat of the Cadillac, because his blood was found all over that back seat.[4]

Neither appellant testified in his own defense. Lewis offered no evidence, but Johnson introduced copies of statements previously made by Sergeant Scott and Officer Brock, as well as excerpts of prior testimony by Ms. Watson and another witness, Darion Clark.

4. Blood was also found on the porch and railing of the house at 916 Shepherd Street. It was matched by DNA testing to Damari

## II

Johnson argues that a statement made during trial by a witness violated his Confrontation Clause rights under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and that its admission should have resulted in a mistrial and a severance. We agree that the admission of the statement violated Johnson's rights under *Bruton,* but we are satisfied that its admission into evidence was harmless under all the circumstances.

Before trial, Johnson moved under Super. Ct.Crim. R. 14 to sever his trial from that of his co-defendant Lewis. One of the grounds for the motion was that statements made by Lewis which the government intended to introduce would violate *Bruton.* This issue was laid to rest when both the government and Johnson's counsel agreed that if the offending statements were redacted to remove any mention of Johnson's presence in the Cadillac, *Bruton* would be satisfied. However, a separate *Bruton* issue emerged during Dorian Clark's testimony that was not anticipated:

Q. [by the prosecutor]: Now, did there come a time ... soon after this, that you had an opportunity to speak with Mr. Lewis?

A. Yes.

\*    \*    \*    \*    \*    \*

Q. . . . [W]hat did he tell you about the crash and about Damari [Thomas]?

MS. SCHREIN [counsel for Lewis]: Objection.

THE COURT: Overruled.

A. What did he tell me about the crash? He told me that they crashed their car.

Q. They being who?

Thomas, as was the blood in the back seat of the Cadillac.

A. Him and David [Johnson].

Q. And what, if anything, did he say about Akito [McMillan]?

A. Yes.

MS. SCHREIN: Objection.

Q. Yes, what? What did he—

THE COURT: We'd better come to the bench.

Both the prosecutor and defense counsel had expected that Clark would testify that McMillan—not Johnson—was the other person in the car with Lewis because that was what Clark had said when he testified before the grand jury.

During the ensuing bench conference, the trial court agreed with Johnson's counsel that Clark's testimony about Lewis' hearsay statement implicating Johnson (*i.e.*, the comment that "him and David" had "crashed" the car) potentially violated *Bruton*. The prosecutor did not disagree, suggesting instead that the court give a curative instruction to the jury and also an instruction to Clark directing him to make no further reference to Johnson. The court agreed because there was "ample" other evidence that Johnson was in the car, thus minimizing the degree of prejudice.

Following the bench conference, the court instructed the jury as follows:

First of all, there was a reference in Mr. Clark's testimony near the end of it just before the recess to something that Mr. Lewis said that Mr. Johnson purportedly did. I forget what it was, whether Mr. Johnson was in the car, or whatever it was. But in any event, any reference that Mr. Lewis allegedly made in his statements to Mr. Clark about things that Mr. Johnson did are not proper or appropriate evidence. And I am striking that reference to Mr. Johnson, and you are to do your very best to put it out of your mind. You may not

consider it in your deliberations in this case.

Let me remind you [that] at the beginning of the trial in my preliminary instructions, and I will tell you this again at the end of the trial ... that we really have two trials going on here, although we are trying to do it all in one trial. We have a trial involving charges against Mr. Johnson, and a trial involving charges against Mr. Lewis. And I told you there would be some circumstances when there was certain evidence that would come in that could be considered only against a particular defendant.

Any statements that you hear this witness or any other witness make as to things that Mr. Lewis allegedly said may be considered only as to Mr. Lewis. And likewise, should there be any witness in this case that testifies to things that Mr. Johnson allegedly said, and I have no idea if there will be that kind of testimony, but if there is that kind of evidence, it can be considered only as to Mr. Johnson.

In other words, anything—any time you hear testimony about something Mr. Lewis allegedly said, you may not consider that in considering any charges against Mr. Johnson.

And should there come a time that you hear anything Mr. Johnson allegedly said, you may not consider that in considering the charges against Mr. Lewis. And that's the reason I am ordering that portion of the testimony stricken.

In its final charge, the court reminded the jury of its previous instructions:

[E]vidence of any statement that either defendant allegedly made may be considered only in assessing the charges against that defendant.

■ In *Bruton* the Supreme Court held that out-of-court statements by a non-testifying co-defendant implicating a non-confessing defendant were inherently prejudicial to the non-confessing defendant because he was denied his rights under the Confrontation Clause. *Bruton*, 391 U.S. at 135–137, 88 S.Ct. 1620; *see Carpenter v. United States*, 430 A.2d 496, 503 (D.C.1981) (en banc). *Bruton* violations are subject to the test set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), "to determine if they are harmless beyond a reasonable doubt." *Foster v. United States*, 548 A.2d 1370, 1379 (D.C.1988); *see Harrington v. California*, 395 U.S. 250, 253, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). "When inadmissible evidence has come before a jury, the grant or denial of a motion for mistrial is committed to the sound discretion of the trial court." *Carpenter*, 430 A.2d at 506 (citations omitted).

Johnson argues that "the only curative action" to deal with the error in allowing the jury to hear Clark's testimony "would have been to declare a mistrial ... and to sever the defendants." We disagree. Although Clark's comment should not have been heard by the jury, its admission was harmless under all the circumstances; consequently, the trial court did not abuse its discretion in denying Johnson's request for a mistrial.

In *Carpenter*, a case with facts very similar to those in the present case, both the court and counsel attempted to prevent a hearsay statement made by a co-defendant incriminating Carpenter from being elicited by redacting any reference to Carpenter. However, as in the instant case, that attempt failed, and the statement offensive to *Bruton* was heard by the jury. This court held that the trial court "did not err in giving limiting instructions in lieu of granting a mistrial" because there was strong evidence placing Carpenter at the scene of the crime, the nature of the inadmissible incriminating reference was "limited," and there were "two sets of limiting instructions." 430 A.2d at 506–507.

Here, as in *Carpenter*, there was strong evidence which significantly limited any damage caused by the offending statement. *See Carpenter*, 430 A.2d at 506. The trial court observed that the degree of prejudice was not "very substantial" because there was "significant other evidence" that Johnson was in the Cadillac: (1) his identification card was found on the back seat; (2) his fingerprint was found on a plastic bag found on the floor under the driver's seat; (3) two witnesses, Rachel Corbie and Officer Brock, saw a man fitting his description sitting in the back seat of the Cadillac; and (4) Johnson was apprehended hiding in the shrubbery near the wrecked Cadillac with a freshly broken arm soon after the crash. Because there was "ample evidence ... that [Johnson] was in the car," the court properly concluded that it could rectify the error by giving a limiting instruction rather than by granting a mistrial and a severance. *See Foster*, 548 A.2d at 1380; *Carpenter*, 430 A.2d at 506. We hold accordingly that trial court did not abuse its discretion in denying Johnson's motion for a mistrial.

### III

Johnson contends that the trial court erred when it failed to grant his motion for judgment of acquittal because, at best, the evidence demonstrated that he was "merely present" during the commission of the crimes, and that mere presence was not enough to permit the jury to find him guilty, either as a principal or as an aider and abettor.

■ In reviewing the denial of a motion for judgment of acquittal, this court con-

siders the evidence in the light most favorable to the government, recognizing the right of the jury to resolve issues of credibility and to draw justifiable inferences. *E.g., Harris v. United States*, 756 A.2d 458, 461 (D.C.2000); *James v. United States*, 718 A.2d 1083, 1087–1088 (D.C. 1998); *Taylor v. United States*, 601 A.2d 1060, 1063 (D.C.1991); *Crawford v. United States*, 126 U.S.App. D.C. 156, 158, 375 F.2d 332, 334 (1967). "This court will reverse only where the government has failed to present evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Porter v. United States*, 826 A.2d 398, 404 (D.C. 2003) (citation omitted). Applying these basic principles, we hold that the trial court did not err in denying Johnson's motion for judgment of acquittal.

■■■■ The government maintains that, at the very least, the evidence showed that Johnson aided and abetted the commission of all the crimes charged.[5] To prove aiding and abetting, the government had to show that "(a) a crime was committed by someone; (b) the accused assisted or participated in its commission, and (c) his participation was with guilty knowledge." *Jefferson v. United States*, 463 A.2d 681, 683 (D.C.1983) (citations omitted).[6]

> "Mere presence at the scene of the crime, without more, is generally insufficient to prove involvement in the crime ... but it will be deemed enough if it is intended to [aid] and does aid the primary actors." ... "Presence is thus equated to aiding and abetting when it is

shown that it designedly encourages the perpetrator, facilitates the unlawful deed—as when the accused acts as a lookout—or where it stimulates others to render assistance to the criminal act." *Hordge v. United States*, 545 A.2d 1249, 1254 (D.C.1988) (citations omitted).

■■■■ We hold that the evidence was sufficient to enable the jury to find Johnson guilty as an aider and abettor of all the charged offenses. That is, the jury could reasonably find from the evidence that Johnson was not "merely present" and that he gave tacit approval to all of the offenses perpetrated by the principal, Lewis; that Johnson could have disassociated himself from Lewis at several points during the sequence of events, but failed to do so; and that Johnson displayed his consciousness of guilt by fleeing from the police and attempting to conceal himself in some bushes. *See, e.g., Prophet v. United States, supra* note 6, 602 A.2d at 1093 ("the jury could reasonably conclude that [the defendant] failed to disassociate himself from [his co-defendant] and tacitly approved [his] actions" when he fled with the co-defendant even after "watch[ing] the robbery and murder"); *Reynolds v. United States*, 587 A.2d 1080, 1084 n. 8 (D.C. 1991) (evidence that defendant was a passenger in a car being chased by the police after a robbery was sufficient to support defendant's conviction for destruction of property when the car crashed during the chase); *In re Q.L.J.*, 458 A.2d 30, 32 (D.C. 1982) (holding that flight can "support an inference of guilty participation" when it

---

5. In the District of Columbia, "[o]ne who aids and abets the principal in committing the crime is charged as a principal." *Tyler v. United States*, 495 A.2d 1180, 1182 (D.C.1985) (citations omitted); *see* D.C.Code § 22–1805 (2001).

6. Stated another way, the government must prove that the aider and abettor "associated

himself with the criminal venture, that he participated in it as in something he wished to bring about, [and] that he sought by his action to make it succeed." *Taylor*, 601 A.2d at 1063 (citation and internal punctuation omitted); *see also Prophet v. United States*, 602 A.2d 1087, 1092 (D.C.1992); *Jefferson*, 463 A.2d at 683 n. 5.

"accompanie[s] conduct that facilitate[s] an unlawful act").

■ Johnson gave tacit approval to the offenses perpetrated by Lewis when he remained in the stolen Cadillac and thus shared in its possession. *See Prophet,* 602 A.2d at 1092. Johnson's presence in the back seat also shows that he was part of the criminal enterprise because, simply by being there, he helped to prevent Thomas from escaping.[7] *See Settles v. United States,* 522 A.2d 348, 358 (D.C. 1987) (affirming conviction of one defendant as an aider and abettor of the other defendant, relying in part on the fact that the aider and abettor's "presence outside the door would certainly have been a strong deterrent to any attempt by the victim to escape"). Indeed, having knowledge of the offenses and failing to withdraw can be sufficient to establish implied approval, and hence aiding and abetting. *See Creek v. United States,* 324 A.2d 688, 690 (D.C.1974) (fact that defendant did not "avail himself of opportunities to withdraw from the scene of the criminal activity" supported conviction as an aider and abettor);[8] *cf. Bolden v. United States,* 835 A.2d 532, 535 (D.C.2003) (affirming conviction of an aider and abettor of a possessory drug offense, holding that "the magnitude and duration of the drug activity taking place in the house while Bolden was present as the lessee and main occupant" was sufficient to establish that she knew the drugs were there and, by "facilitating" that activity, "had associated herself" with it). Johnson had a number of opportunities to disassociate himself from the criminal enterprise, but he never did so. He was in the Cadillac when Thomas was kidnapped, and was still there when Thomas was stabbed twelve times. Johnson remained with Lewis after Lewis shot Thomas twice in the head in Johnson's presence.[9] Johnson was still in the car with Lewis during the police chase, fled on foot along with Lewis (albeit in a different direction) after the car crashed, and tried to evade capture by hiding in dense shrubbery. From all of this evidence the jury could readily and reasonably find that Johnson was guilty of aiding and abetting all of the crimes charged.

■ Johnson also contends that there was insufficient identification evidence to establish that he was present during the sequence of events that led to Mr. Thomas' murder. This argument is wholly without merit. There was clear eyewitness testimony, as well as physical evidence, which would permit a reasonable juror to find that Johnson was involved in each of the charged offenses. Among other things,

---

7. From the testimony it seems certain that Lewis, Johnson, and Thomas were all in the back seat following the carjacking and abduction, with Johnson seated on the right side, Thomas in the middle, and Lewis on the left side.

8. In *Creek* the defendant's presence was not innocent. He "stationed himself at the front gate," apparently acting as a lookout, while his companion robbed the victim at the door of her house. 324 A.2d at 689. He then "fled with the thief and ... was still with him when they were confronted by the police." *Id.* We affirmed Creek's conviction as an aider and abettor, holding that an "inference" that his presence by the gate "designedly encouraged or facilitated the robbery [was] clearly warranted." *Id.* (internal punctuation omitted).

9. We note that almost twenty minutes elapsed from the time that Tyronica Watson witnessed the carjacking and the time that Rachel Corbie heard the gunshots. The jury could reasonably have inferred that Johnson had at least two opportunities during that period to withdraw from the criminal enterprise: when the kidnapping took place, and later when the car was stopped and Thomas—no doubt bleeding from his stab wounds—was taken out of the back seat to be shot.

Johnson's photo identification card was found in the back seat of the Cadillac—the same back seat that was drenched with Thomas' blood—and a plastic bag with Johnson's fingerprint on it was recovered from the floor of the Cadillac, under the driver's seat. Each of these pieces of physical evidence showed that Johnson was present at the scene of the murder and strongly linked Johnson to all the crimes. Furthermore, both Ms. Corbie and Officer Brock saw a man in the back seat who, like Johnson, had braided hair. The jury could reasonably find that this man was in fact Johnson. Finally, Johnson ran from the scene of the crash, was immediately pursued by the police, and was found hiding in some bushes a few minutes later. From his flight the jury could, at the very least, infer consciousness of guilt. Even though, as in *Brooks v. United States*, 717 A.2d 323 (D.C.1998), there was no specific eyewitness testimony identifying Johnson as one of those involved in the crimes (although he was identified by a police officer as the man with braided hair who ran from the crash), "the identity of the defendant may be inferred from all the evidence before the jury." *Id.* at 328. Here, as in *Brooks*, "the record is replete with evidence sufficient to allow the jury to find that the defendant who appeared at trial was the person who committed the acts charged." *Id.* at 327.

We find no merit in Johnson's challenge to the sufficiency of the evidence.

## IV

▇ Both appellants argue, and the government concedes, that certain convictions merge. In *Byrd v. United States,*

510 A.2d 1035, 1036–1037 (D.C.1986) (en banc) (adopting the holding in *Byrd v. United States*, 500 A.2d 1376 (D.C.1985), *vacated*, 505 A.2d 51 (D.C.1986)), this court en banc explicitly forbade multiple convictions for murder when there is only one victim. *Accord, e.g., Thacker v. United States*, 599 A.2d 52, 63 (D.C.1991). Both Johnson and Lewis are correct in asserting that their convictions of first-degree felony murder while armed based on the armed kidnapping (count five of the indictment), first-degree felony murder while armed based on the attempted armed robbery (count six), and second-degree murder while armed (under count four) [10] must be vacated because these convictions merge with their convictions of first-degree premeditated murder (count seven). We elect, in our discretion, to vacate all of appellants' murder sentences, including count seven, because vacating fewer than all of them could "upset an interdependent sentencing structure." *Thorne v. United States*, 471 A.2d 247, 249 (D.C.1983). On remand the trial court must resentence both appellants anew on only one count of murder. We leave the choice of that count up to the trial court, in its discretion. Of course, if the court chooses to resentence on one of the two remaining felony murder counts, then it must vacate the conviction of the underlying felony. *See Adams v. United States*, 502 A.2d 1011, 1026–1027 & n. 22 (D.C.1986).

▇ We also hold that each appellant's two convictions of destroying property merge into one. On this point the case is controlled by *Carter v. United States*, 531 A.2d 956 (D.C.1987), in which a car chase resulted in three separate collisions, but five cars were damaged, including the sto-

10. Count four of the indictment charged Johnson and Lewis with first-degree felony murder while armed, with the armed carjacking as the predicate felony. On this count the jury found them not guilty of felony murder, but guilty of second-degree murder while armed as a lesser included offense.

len car that the defendant was driving as well as a police cruiser. We held that two of the defendant's five destruction of property convictions should be vacated because there were only three collisions, even though they caused damage to five cars. *Id.* at 964. Similarly, in the case at bar, since the stolen Cadillac and the post office truck were damaged in a single collision, each appellant can be convicted of no more than one count of destruction of property. On remand, therefore, the trial court shall, as to each appellant, vacate one of the two destruction of property convictions.

## V

Finally, appellant Johnson contends that his conviction should be reversed on the ground of ineffective assistance of counsel. He made this same claim, however, in a motion to vacate sentence under D.C.Code § 23–110 (2001), which he filed in the trial court while this appeal was pending. That motion was denied after he filed his brief in the instant case, and Johnson has appealed from that denial. The § 23–110 appeal, *Johnson v. United States,* No. 04–CO–288, has been fully briefed and is currently pending before another division of this court, which has a full record before it on the ineffective assistance issue (which we do not have in the present case). In these circumstances we decline to consider the ineffective assistance claim here, but without prejudice to its resolution by the other panel in appeal No. 04–CO–288. "We reiterate that in the overwhelming majority of cases, it is inappropriate to raise the issue of ineffective assistance of counsel on direct appeal. Attempts to do so are rarely if ever successful." *Simpson v. United States,* 576 A.2d 1336, 1338–1339 (D.C. 1990); *see generally Shepard v. United States,* 533 A.2d 1278 (D.C.1987).

In addition, Johnson raises on direct appeal a separate claim of pre-trial ineffective assistance under *Monroe v. United States,* 389 A.2d 811 (D.C.1978), and *Farrell v. United States,* 391 A.2d 755 (D.C. 1978). Ordinarily, we would consider this type of claim on direct appeal because we have the complete record relevant to the *Monroe–Farrell* issue before us. However, since Johnson also included the *Monroe–Farrell* claim in his § 23–110 motion, and since neither party in the present appeal was able to address the issues adequately because their briefs were filed before the relevant transcript became available, we will defer to our colleagues in the second appeal to decide the *Monroe–Farrell* claim as well.

## VI

We affirm all of the convictions of each appellant on the merits. Our affirmance, however, is without prejudice to final resolution of appellant Johnson's claims of ineffective assistance of counsel, which we decline to consider because they are pending before another division of this court in appeal No. 04–CO–288. We remand these cases for vacatur of each appellant's redundant sentences and for partial resentencing, as set forth in part IV of this opinion.

*So ordered.*