**Tavon E. VINES, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 11–CF–843.**

District of Columbia Court of Appeals.

Submitted Oct. 9, 2012.

Decided July 11, 2013.

As Amended Sept. 19, 2013.

Edward F.C. Gain, Jr., was on the brief for appellant.

Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and John P. Mannarino, Magdalena Acevedo, and Peter C. Lallas, Assistant United States Attorneys, were on the brief for appellee.

Before FISHER and EASTERLY, Associate Judges, and KING, Senior Judge.

KING, Senior Judge:

On May 11, 2011, a jury found appellant Tavon E. Vines guilty of eight separate charges, including one count of robbery,[1] two counts of malicious destruction of property,[2] and one count of simple assault.[3] On appeal from those convictions, Vines argues: (1) the trial court erred by allowing the joinder of all charges against him in a single trial; (2) his two convictions for malicious destruction of property merged under the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution; and (3) the evidence at trial was insufficient to convict him of either simple assault or malicious destruction of property. Because Vines' arguments are unpersuasive, we affirm.

## I. Factual Background

The charges against Vines arise from two robberies on July 26, 2010, and the efforts of law enforcement officers to apprehend him in connection with those robberies on the following day. The government ultimately charged Vines with a total of thirteen charges arising from the events of these two days, all of which were joined for a single trial.[4]

---

1. D.C.Code § 22–2801 (2001).

2. D.C.Code § 22–303 (2001).

3. D.C.Code § 22–404(a)(1) (2001).

4. Prior to trial, the court denied Vines motion to sever the charges arising from the July 26 robberies from the charges arising from his conduct on July 27.

At trial, the government presented the testimony of Serguei Korpein and Marcie Bane. Both Bane and Korpein testified that a young black man stole their iPhones from them on July 26. The government also offered the testimony of Jon–David Schlough, who testified that he was nearby when a man stole Bane's phone. He further testified that he overheard Bane's cry for help and chased the perpetrator to an eggshell-white Cadillac Escalade SUV. Schlough noted the license plate number on the vehicle, called 911, and reported the number.

The government also presented the testimony of Officer Robert Ferretti. Ferretti testified that on July 27, he began following a white Cadillac Escalade SUV with a license plate number similar to the number Slough provided the previous day. He pulled behind the SUV and began to "pace" it. Vines, the driver of the SUV, then began to make "evasive" maneuvers. Officer Ferretti attempted to pull the SUV over, at which point it fled down Pennsylvania Avenue toward Washington Circle. Vines then made a number of reckless maneuvers in traffic. As Officer Ferretti gave chase, Vines drove the SUV down the wrong side of the road toward oncoming traffic at a rate of approximately 35–40 mph. Vines drove through a red light, nearly striking a group of pedestrians. The chase ended when the SUV collided with multiple vehicles in an intersection, leaving the SUV disabled. The SUV's occupants, including Vines, then abandoned their vehicle and fled on foot. Officer Ferretti ultimately apprehended Vines outside a nearby office building.

## II. Joinder and Severance

We first consider Vines's argument that the trial court improperly allowed joinder of the charges arising from the July 26 robberies and the charges arising from the July 27 car chase for a single trial. Whether initial joinder was proper is a matter of law this court considers *de novo. Crutchfield v. United States,* 779 A.2d 307, 321 (D.C.2001). Under Super. Ct.Crim. R. 8(a), joinder of two or more criminal charges for trial is permissible so long as those charges are: (1) "of the same or similar character," (2) "based on the same act or transaction," or (3) based on "acts or transactions connected together or constituting parts of a common scheme or plan." *Gooch v. United States,* 609 A.2d 259, 262 (D.C.1992). Two crimes are sufficiently "connected together" if "proof of one crime constitutes a substantial portion of proof of the other." *Sweet v. United States,* 756 A.2d 366, 375 (D.C. 2000) (internal quotation marks and citation omitted). We construe Rule 8(a) broadly in favor of initial joinder. *Id.*

In this case, we conclude that the trial court did not err by permitting the initial joinder of all charges. It is true that the charges against Vines encompassed two logically distinct sets of offenses. The first set, including the two robbery charges, arose from the events that took place on July 26. The second set of charges arose from the July 27 car chase. However, the two sets of charges were sufficiently "connected together" to justify joinder. There was a substantial overlap of evidence between the sets of charges. The July 27 charges arose after Officer Ferretti attempted to detain Vines on suspicion of his having been involved in the July 26 robberies. At the time Officer Ferretti attempted to detain him, Vines was operating the same SUV that Slough saw him use to flee the scene of the robberies on the previous day. Based on this connection, evidence regarding the July 26 robberies would have been admissible in a separate trial on the July 27 charges to show Vines' motive for fleeing from police. *See Johnson v. United States,* 683 A.2d 1087, 1092 (D.C.1996) (evidence of other crimes admissible to prove motive) (citing

*Drew v. United States,* 118 U.S.App.D.C. 11, 14, 331 F.2d 85, 88 (1964)). Moreover, evidence regarding the July 27 events would have been admissible in a separate trial on the July 26 charges to show Vines' consciousness of guilt and his identity as the perpetrator of the robberies. *See id.* (evidence of other crimes admissible to prove identity); *see also Smith v. United States,* 777 A.2d 801, 807 (D.C.2001) ("It is well settled in this jurisdiction that evidence of flight or disappearance can be admitted at trial as evidence of consciousness of guilt."). This "substantial overlap" in evidence was sufficient to justify joinder. *Sweet, supra,* 756 A.2d at 375. Finally, because there was such an overlap, joinder served the goals of "trial economy and convenience" by insuring that the relevant events "need only be proved once." *Gooch, supra,* 609 A.2d at 264. Thus, joinder in this case served the "primary purpose" of Rule 8(a). *Id.* As a result, we are unable to say that the trial court erred by permitting initial joinder.

 In a related argument, Vines contends that the trial court erred by denying his motion to sever under Super. Ct.Crim. R. 14. We review the trial court's ruling on a motion to sever for abuse of discretion. *Cox v. United States,* 498 A.2d 231, 235 (D.C.1985). Rule 14 permits the trial court to sever otherwise properly joined offenses to avoid prejudice, as "justice requires." *Workman v. United States,* 15 A.3d 264, 266 (D.C.2011). To justify severance, a defendant must show "the most compelling prejudice," from which the trial court will be unable to protect if the offenses are tried together. *Id.*

 We conclude that the trial court did not err by denying Vines' motion to sever the offenses. Vines failed to make any proffer or otherwise attempt to show he would suffer prejudice from the joinder of all charges for trial, other than to argue in conclusory fashion that "[r]obbery is not of the same or similar character as the other offenses." Yet as we noted *supra,* evidence regarding each set of charges would have been admissible in a separate trial on the other set. Thus, it is unclear exactly how a single joint trial on all charges could have prejudiced Vines, regardless of the character of the offenses. *See Bailey v. United States,* 10 A.3d 637, 643 (D.C.2010) ("[A] motion to sever will be granted only where the evidence would not be mutually admissible at separate trials."). Furthermore, the trial court instructed the jury to consider the charges separately and distinctly. On appeal, this court presumes juries to have understood and followed the trial court's instructions. *Smith v. United States,* 315 A.2d 163, 167 (D.C.1974), *cert. denied,* 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974). Thus, absent some evidence that the jury ignored the court's instruction and failed to consider each offense distinctly, we cannot find prejudice resulting from joinder. The record is utterly lacking in such evidence. Indeed, the jury's verdicts affirmatively show that it acted in accordance with the court's instructions. While the jury convicted Vines of robbing Korepin, it was unable to reach a verdict on the Bane robbery. The jury's ability to consider these offenses separately and distinctly shows that it did not "cumulate the evidence improperly to find guilt or to infer that appellant had a criminal disposition." *Arnold v. United States,* 511 A.2d 399, 406 (D.C.1986) (no prejudice resulting from joinder of offenses where colloquy between court and jury forewoman showed that jury reached its verdict on two separate counts of armed robbery on two different days during course of deliberations). Because of the mutual admissibility of evidence between both sets of charges and the jury's ability to consider those charges separately and distinctly, we cannot conclude that

Vines suffered any prejudice as a result of the denial of his motion to sever. Thus, we are satisfied that the trial court did not abuse its discretion by denying Vines' severance motion.

### III. Merger

■■■■ We next consider Vines's argument that his two convictions for malicious destruction of property merged as a matter of law.[5] This court considers whether two convictions merge under the Double Jeopardy Clause *de novo. Owens v. United States,* 497 A.2d 1086, 1095 (D.C.1985). The Double Jeopardy Clause prohibits multiple punishments for the same offense. *Maddox v. United States,* 745 A.2d 284, 294 (D.C.2000). Punishments do not merge, however, when they arise out of separate criminal acts or transactions. *Hanna v. United States,* 666 A.2d 845, 852 (D.C.1995). Punishments also do not merge when a defendant perpetrates separate crimes against separate victims. *Id.* at 855. In such cases, there is no constitutional limitation on imposing separate punishments for each crime. *Id.* at 853.

■■■ Here, we conclude that Vines's two separate convictions for destruction of property do not merge, because each conviction was the result of a separate criminal act against a separate victim. The testimony at trial showed that Vines's two convictions arose from two collisions. The first conviction arose from the damage he inflicted on Sharon Garrett's vehicle. The second conviction was based on his subsequent collision with Laura May's vehicle. At trial, Garrett testified that Vines's vehicle struck her vehicle first, and then proceeded to strike May's vehicle. This testimony established two distinct collisions with two separate vehicles and two separate victims.[6]

■■■ That Vines committed a single reckless act does not control our analysis. In deciding whether certain conduct constitutes a single offense or multiple offenses, we do not simply count the number of discrete "acts." That is, there is no general rule that a single act can support only a single conviction; multiple punishments are permissible even where multiple charges are the product of a single act. *See, e.g., Ruffin v. United States,* 642 A.2d 1288, 1298 (D.C.1994) ("[W]here a single assaultive act results in the criminal injury of multiple victims, there may be as many

---

**5.** Vines also argues that the evidence was insufficient to convict him of two counts of malicious destruction of property because there was no evidence to show he committed two separate criminal acts. These arguments are effectively identical for our purposes here. Thus, we consider both under the rubric of merger.

**6.** The record is somewhat murky regarding the exact order of events during these collisions. At trial, Garrett testified that Vines's vehicle struck three different vehicles: her vehicle, a green Honda, and a mail truck. She stated that Vines's vehicle struck her vehicle first. It then struck the Honda, and then the mail truck.

May, who was driving the green Honda testified that she did not see Vines's vehicle before it struck her. Because she did not see what happened before the second collision,

her testimony is largely unhelpful in sorting out the exact sequence of events.

Likewise, Officer Ferretti's testimony does not do much to clarify the ambiguity in the record. He testified: "From what I remember, I think [Vines's] vehicle hit the back of one car and the front of another." His testimony does not make clear whether this was a single collision or two collisions, one closely following the other.

Because Ferretti and May's testimony do not resolve the issue, we are left with Garrett's version of the events. We think the jury could fairly conclude, based on Garrett's testimony, that there were two distinct collisions involving Garrett's and May's vehicles. Because there were two collisions, and those two collisions led to two charges regarding acts against two separate victims, the convictions do not merge. *See Hanna, supra,* 666 A.2d at 855.

offenses as there are victims."); *Williams v. United States*, 569 A.2d 97, 104 (D.C. 1989) (assuming defendant's conduct constituted a single assaultive act, yet nevertheless upholding seven separate manslaughter convictions); *Murray v. United States*, 358 A.2d 314, 320 (D.C.1976) (affirming two negligent-homicide convictions in connection with a single car crash). Rather than simply tallying "acts," we have looked to the offense's definition. Where the definition contemplates that an injury to each new victim will constitute a separate offense, we have endorsed the imposition of multiple punishments. *See Williams, supra,* 569 A.2d at 104 (looking to background principles of District of Columbia law); *Murray, supra,* 358 A.2d at 320 (looking to legislative intent).[7]

■ As to malicious destruction of property, we understand D.C.Code § 22–303 to contemplate a new offense for each new victim. The statute punishes the destruction of "any public or private property," but does not further define "property." Nevertheless, that term is not ambiguous: "property" is generally defined by reference to the individual interests therein. *See* BLACK'S LAW DICTIONARY 402 (8th ed.1999) (defining "criminal damage to property" as "[i]njury, destruction, or substantial impairment to the use of property ... *without the consent of a person having an interest in the property.*" (emphasis added)); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1818 (1993) (defining "property" as "something which may be owned or possessed .... *a valuable right*

*or interest* primarily the source of wealth" (emphasis added)). Indeed, § 22–303 itself punishes the offender for destroying property only when that property is "not his or her own"—explicitly distinguishing between individual interests. Likewise, for other offenses, our law explicitly defines "property" by reference to such interests. *See* D.C.Code § 22–3201 (2009) (defining "property of another" as "any property in which a government or a person other than the accused *has an interest* " (emphasis added)). Moreover, we have recognized that the statute's protection extends to individual interests in property. *See Baker v. United States*, 891 A.2d 208, 215 (D.C.2006) (defining "injury" to property as "detriment to, or violation of, person, character, feelings, rights, property, or interests, or value of the thing" (internal quotations omitted)); *Jackson v. United States*, 819 A.2d 963, 965 (D.C. 2003) ("In fact, to interpret such statutes as not protecting individuals with partial ownership rights would be inconsistent with the general purpose of such a statute."). Finally, § 22–303 does not prohibit any particular defined "act," but rather proscribes only conduct which has a particular effect: i.e., "maliciously injur[ing] or break[ing] or destroy[ing] ... any public or private property." This is "a powerful indication of the legislative intent" that the offense be defined not by reference to the "acts" committed, but to the property interests injured. *Speaks v. United States*, 959 A.2d 712, 716–17 (D.C.2008) (discussing D.C.Code § 22–1101 (2001)). Accordingly, we read § 22–303 as contemplating a

---

7. The dissent would take a different approach. Because Vines's collision with May's and Garrett's vehicles were not "each the result of its own fresh impulse," the dissent would find only one offense. But that is not our law. Indeed, as the dissent concedes, had May and Garrett died as a result of Vines's single reckless act, he could be charged with two counts of negligent homicide, regardless of whether Vines acted with a

fresh impulse as to each victim. *See Murray, supra,* 358 A.2d at 320.

The dissent attempts to distinguish this case by arguing that malicious destruction of property is not a victim-specific crime; thus, we need do no more than add up Vines's "acts." But as discussed *infra,* we understand D.C.Code § 22–303 to distinguish between separate harms to individual victims.

separate offense as to the destruction of each separate victim's property, rather than the destruction of "property" in some more-general sense.[8]

Here, Vines caused two separate victims to suffer injuries to two distinct property interests. May and Garrett each suffered an injury to their interests in their respective vehicles.[9] Accordingly, Vines is guilty of malicious destruction of property against two separate victims. And because his act caused distinct injuries to two separate victims, his convictions do not merge. *See Hanna, supra,* 666 A.2d at 855; *see also Wages v. United States,* 952 A.2d 952, 964–65 (D.C.2008) (two convictions for possession of a firearm during a crime of violence arising out of a single incident did not merge despite proximity in time where they involved distinct assaults against separate victims).[10]

8. The dissent argues that the Rule of Lenity requires us to reach its—and Vines's—preferred interpretation: that the statute does not distinguish between individual interests in property. But the Rule of Lenity is merely a "secondary rule of construction," which " 'can tip the balance in favor of criminal defendants only where, exclusive of the rule, a penal statute's language, structure, purpose, and legislative history leave its meaning genuinely in doubt.' " *Luck v. District of Columbia,* 617 A.2d 509 (D.C.1992) (quoting *Lemon v. United States,* 564 A.2d 1368, 1381 (D.C. 1989)). It "comes into operation at the end of the process of construing what [the legislature] has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Id.* (quoting *Callanan v. United States,* 364 U.S. 587, 596, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961)). Thus, because § 22–303 is not ambiguous, appeals to the Rule of Lenity are misplaced.

9. The dissent argues that May and Garrett "never testified that they owned the cars they were driving and the record at least suggests that others had property interests in these vehicles." We disagree. Rather, the record plainly shows that the government both sought to establish that May and Garrett owned their vehicles and was successful in doing so. First, the charging indictment alleged that Vines "did injure, break, and destroy ... a car, property of Sharon Garrett," and "a car, property of Laura May." At trial, both May and Garrett repeatedly referred to their respective vehicles as "my truck" and "my car," and both described the amounts they spent on repairs. May indicated that she carried insurance on her car, and Garrett brought to court receipts for the amounts she paid out-of-pocket. Moreover, Vines himself did not complain of any lack of proof of ownership: in his motion for judgment of acquittal, his attorney did not raise the issue.

Nor did he raise the issue in his briefs in this court. Accordingly, we think the record clearly shows that the government both sought to and did establish ownership of the vehicles.

We also note that, by its terms, the statute did not require the government to prove who owned the affected property beyond proving that the defendant did not own it. *See* § 22–303 (requiring proof that the property the defendant damaged was "not his or her own"). On this point, the government was successful. And for the purposes of our merger analysis, there is no suggestion that the same person owned both cars.

10. Vines's and the dissent's reliance on *Carter v. United States,* 531 A.2d 956 (D.C.1987), is misplaced. In *Carter,* this court held that two of the defendant's five convictions for malicious destruction of property merged. The sequence of events in *Carter* was as follows: Carter, driving a vehicle owned by Barber without Barber's permission, struck a vehicle owned by J. Wilson, which was then shoved into a vehicle owned by Blake. 531 A.2d at 957–58. The Barber vehicle then collided with a stop sign, dragging the stop sign into a vehicle owned by E. Wilson, causing damage to that vehicle. *Id.* at 958. The Barber vehicle then struck a police cruiser, causing damage to it. *Id.* at 958. Carter was convicted of malicious destruction of property as to the Barber, J. Wilson, Blake, and E. Wilson vehicles and the police cruiser. *Id.* at 958. The government conceded, and we agreed, that the charge with respect to Blake's vehicle merged with the conviction for the J. Wilson vehicle, and the charge with respect to the Barber vehicle merged with respect to the cruiser. *Id.* at 957, 964. The damage to the Blake vehicle occurred when it was struck by the J. Wilson vehicle—i.e., the damage to

## IV. Sufficiency of the Evidence

 Finally, we consider Vines' argument that the evidence was insufficient to convict him of either simple assault or malicious destruction of property. When reviewing for sufficiency of the evidence, we consider the evidence in the light most favorable to the government. *Mitchell v. United States*, 985 A.2d 1125, 1133–34 (D.C.2009). We draw all inferences in favor of the prosecution, so long as they are supportable under any view of the evidence. *Rose v. United States*, 49 A.3d 1252, 1259 (D.C.2012). The evidence at trial need not conclusively establish guilt to sustain a conviction. *United States v. Walker*, 545 F.3d 1081, 1088 (D.C.Cir. 2008). Rather, it is sufficient that a reasonable juror could have concluded that the evidence established the defendant's guilt beyond a reasonable doubt. *Id.*

 Based on our review, we are persuaded that the evidence was sufficient to convict Vines of simple assault. In order to sustain a conviction for simple assault, the government must establish: (1) an act on the part of the defendant; (2) the apparent present ability to injure the victim at the time the act is committed; and (3) the intent to perform the act which constitutes the assault at the time the defendant commits the act. *Bradley v. United States*, 856 A.2d 1157, 1161 (D.C.2004).

We have described simple assault as a general intent crime. *See, e.g., Stroman v. United States*, 878 A.2d 1241, 1245 (D.C. 2005); *Lee v. United States*, 831 A.2d 378, 381 (D.C.2003). The finder of fact may permissibly infer the general intent to commit a crime from the mere doing of the act that constitutes the crime. *Stroman, supra*, 878 A.2d at 1245. Here, the evidence at trial demonstrated that Vines committed the acts constituting the assault on May. The government presented evidence that Vines led police on a high-risk chase down a busy street in downtown Washington, D.C., the result of which was a violent collision with May's vehicle. May suffered physical injuries as a result of this collision, including injuries to her right arm and neck. There is no suggestion that Vines acted unconsciously or involuntarily. Thus, based on Vines' actions, the jury could reasonably have inferred he intended to commit the act constituting the assault.

Vines argues, however, that although this court has consistently referred to simple assault as a general intent crime, some of our decisions effectively treat simple assault as a specific intent crime. *See Buchanan v. United States*, 32 A.3d 990, 992–1002 (D.C.2011) (Ruiz, J., concurring) (reviewing cases). He argues that these decisions require the government to prove

those two vehicles was clearly simultaneous. The damage to the Barber vehicle was caused when it collided with the J. Wilson vehicle, the E. Wilson vehicle, and the police cruiser. Thus, the charge with respect to the J. Wilson vehicle did not merge with the charge related to the E. Wilson vehicle or the charge related to the cruiser. *Id.* at 964. We are satisfied in this case that the collision of Vines's vehicle with May's vehicle was a separate incident from the collision with Garret's vehicle, just as we determined in *Carter* that the E. Wilson and cruiser collisions were separate from each other and from the collision with the J. Wilson vehicle. *Id.* at 964. Therefore, they do not merge.

Finally, we also note that the circumstances of the merged counts in *Johnson v. United States*, 883 A.2d 135, 144–45 (D.C.2005), were the same as the circumstances of the collision of the Barber vehicle and the police cruiser in *Carter*. In both cases the accused was driving a vehicle without the consent of the owner of that vehicle, and because the damage to the vehicle being driven and the vehicle struck occurred simultaneously, the separate charges of destruction of property merged. *See id.* at 138, 144–45; *Carter, supra,* 531 A.2d at 957–58, 964.

that he had either: (a) the specific intent to cause bodily harm; or (b) the specific intent to place his victim in reasonable apprehension of bodily harm in order to sustain a conviction. However, we need not address the correctness of Vines' understanding of our case law to resolve this appeal. Even assuming Vines is correct, a reasonable juror could have inferred the intent to cause bodily harm from his extremely reckless conduct, which was almost certain to cause bodily injury to another. *See Wilson–Bey v. United States,* 903 A.2d 818, 839 n. 38 (D.C.2006) (en banc) (jury may infer from the performance of an act the intent to cause the natural and probable consequences of that act).

This result is consistent with our case law, which permits a finder of fact to infer the general intent to commit a crime from reckless conduct. For instance, this court has sustained convictions for assault with a dangerous weapon ("ADW") based on reckless conduct. In *Powell v. United States,* 485 A.2d 596, 597 (D.C.1984), we affirmed the defendant's conviction for ADW in violation of D.C.Code § 22–502 (1981) (current version at D.C.Code § 22–402 (2001)). In circumstances very similar to this case, the defendant in *Powell* was fleeing police at a high rate of speed when he struck another vehicle. *Id.* at 597–98. The collision caused serious injuries to one passenger and the death of another. *Id.* at 598. The evidence at trial did not indicate that the defendant specifically intended to injure his victims. *Id.* at 597–98. Indeed, there was substantial evidence to the contrary. *See id.* at 598. Nevertheless, this court affirmed the ADW conviction. *Id.* at 597. Likewise, in *Parker v. United States,* 123 U.S.App.D.C. 343, 359 F.2d 1009 (1966),[11] the D.C. Circuit held that proof of specific intent to injure is not necessary to sustain a conviction for ADW. The court noted that former D.C.Code § 22–502 did not include any words of intent, such as "willfully" or "with intent." *Id.* at 345, 359 F.2d at 1101. Rather, it "simply says that 'every person convicted . . . of an assault with a dangerous weapon, shall be sentenced to imprisonment for not more than ten years.'" *Id.* at 345–46, 359 F.2d at 1011–12 (quoting § 22–502). The court concluded that, "[w]hether . . . weapons are used purposely to inflict injury *or only recklessly,* if the other elements of an assault are present, the conduct still falls within the ambit of the statute." *Id.* at 346, 359 F.2d at 1012 (emphasis added) (footnote omitted). Thus, it is clear that a conviction for ADW can be sustained by proof of reckless conduct alone.

If reckless conduct is sufficient to establish the requisite intent to convict a defendant of ADW, it necessarily follows that it is enough to establish the intent to convict him of simple assault. The four elements of ADW are simply the three elements of simple assault, plus the use of a dangerous weapon. *Williamson v. United States,* 445 A.2d 975, 978 (D.C.1982). The intent elements for the two offenses are identical. *See id.* at 977 (noting that both ADW and simple assault are general intent crimes). Moreover, the relevant statutory language suggests the intent elements are the same. D.C.Code § 22–404 (2001) codifies criminal assault in the District of Columbia, but does not define the term "assault." Section 22–402, which codifies ADW, also uses the term "assault" without any additional definition. Neither statute contains any language specifying the requisite *mens rea. See Parker, supra,* 123 U.S.App.D.C. at 345, 359 F.2d at 1011 (noting that former § 22–502 used no

---

11. Because these cases were decided before February 1, 1971, this court considers them binding precedent. *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

terms of intent). Given that this court has affirmed convictions under § 22–402 based on purely reckless conduct, *see Powell, supra*, 485 A.2d at 597, it follows that the same conduct is sufficient to establish the requisite intent under § 22–404.

Based on the foregoing, and making all reasonable inferences in favor of the government, we conclude that the evidence was sufficient to convict Vines of simple assault. We need not decide whether it was necessary for the government to show that Vines possessed the intent to injure May and Garrett or only the intent to commit the acts constituting the assault. Even if the greater proof was necessary, the jury could permissibly infer such intent from Vines' extremely reckless conduct, which posed a high risk of injury to those around him.

 Likewise, we are persuaded that the evidence was sufficient to convict Vines of malicious destruction of property. He argues on appeal that the evidence at trial failed to establish he acted with "malice." In order to prove a defendant acted with "malice," the government must show: (1) the absence of all elements of justification, excuse or recognized mitigation; and (2) either (a) the actual intent to cause a particular harm, or (b) "the wanton and willful doing of an act *with awareness of a plain and strong likelihood that such harm may result." Guzman v. United States*, 821 A.2d 895, 898 (D.C.2003) (quoting *Thomas v. United States*, 557 A.2d 1296, 1299 (D.C.1989)) (emphasis in original). In this case, the government presented evidence that Vines fled police officers at a high rate of speed, drove down the wrong side of the road, ran through a red light, and collided with multiple vehicles. As noted *supra*, this evidence suggests a high degree of recklessness. The jury could reasonably infer from this reck-

less behavior that Vines acted willfully and in spite of a "plain and strong likelihood" that his actions would result in property damage. *Guzman, supra*, 821 A.2d at 898. Thus, the evidence was clearly sufficient to show that Vines acted with "malice."

For the foregoing reasons, we affirm the convictions of all counts.

EASTERLY, Associate Judge, concurring in part and dissenting in part.

I concur with the majority opinion in all respects but one: in my view, Mr. Vines's two destruction of property convictions should merge. The majority opinion holds that merger of Mr. Vines's two convictions is not required both because there were "two distinct collisions" and because Mr. Vines collided with "two separate vehicles and two separate victims." This holding is unsupported by the facts and by the law.

The determination that there were "two distinct collisions" is unsupported by a record that, contrary to the majority opinion's characterization, is not at all "murky regarding the exact order of events during these collisions." Instead, as set forth in more detail below, the record establishes that Mr. Vines caused one multi-car accident when he drove through a red light and collided in quick succession with two vehicles that had the right of way and were contemporaneously moving through the intersection.[1] There was no "fork in the road" for Mr. Vines—that is, some opportunity for him to make a choice not to hit the second car after he had hit the first—that demarks "two distinct collisions" and thereby authorizes double punishment.

Even so, to start with these facts is to begin the merger analysis in the wrong place. The Double Jeopardy clause pro-

---

1. The witnesses at trial testified that Mr. Vines also hit a mail truck in the same inter-section, but that collision was not charged as a separate count of destruction of property.

hibits multiple punishments for the same legislatively defined offense. This begs the question: as set forth in D.C.Code § 22–303 (2001), what are the elements of the crime of destruction of property? Is this offense defined as an injury-to-individual-property-interests crime as the majority opinion asserts? The plain language of the statute provides no support for such a construction, and neither does the assortment of citations to dictionary definitions, other provisions of the D.C.Code, and inapposite case law to which the majority opinion cites. Furthermore, the majority opinion declines to follow two decisions from this court—*Carter v. United States*, 531 A.2d 956, 964 (D.C.1987), *abrogated on other grounds by McCrae v. United States*, 980 A.2d 1082 (D.C.2009), and *Johnson v. United States*, 883 A.2d 135, 144–45 (D.C. 2005)—that make it clear that the crime of destruction of property has not been interpreted by this court with individual property interests in mind. Rather, in both *Carter* and *Johnson*, this court held that, when a defendant simultaneously causes damage to two vehicles owned by different people, this act of destruction supports only a single punishment. *Johnson*, 883 A.2d at 144–45; *Carter*, 531 A.2d at 964.

The majority opinion effectively overrules *Carter* and *Johnson*—something this panel is not empowered to do. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971) ("As a matter of internal policy, we have adopted the rule that no division of this court will overrule a prior decision of this court ... and that such result can only be accomplished by this court en banc."). In so doing, the majority opinion muddles our law on merger. And last but not least, it upholds a violation of Mr. Vines's rights under the Double Jeopardy Clause. Accordingly, I dissent from the majority opinion's holding on merger.

### I. The Evidence at Trial Regarding the Collision

Three witnesses testified at trial about the collision of Mr. Vines's Cadillac Escalade with two vehicles at the intersection of 19th and Pennsylvania, N.W.: the police officer who pursued Mr. Vines in a car chase down Pennsylvania Avenue, Officer Robert Ferretti, and the drivers of the two cars that were hit, Ms. Sharon Garrett and Ms. Laura May.[2]

Officer Ferretti was arguably the witness with the best vantage point of the accident; at the beginning of the multi-block car chase, he was "[r]ight behind" the SUV, only "[a] car's length" away, and he remained "behind the vehicle from start to finish." Officer Ferretti testified that he was pursuing Mr. Vines's SUV down Pennsylvania Avenue N.W. when it ran a red light at 19th Street and drove into traffic that had the right of way:

> [At] 19th Street I remember specifically he had a red light, and the vehicle—I mean [he] had the red light on Pennsyl-

2. Although both women used the possessive pronoun "my" to refer to the vehicles they were driving, neither Ms. Garrett nor Ms. May ever testified that they owned these vehicles and the record at least suggests that others had property interests in them. The government asked Ms. Garrett, "[W]hat type of car did you have[?]" on the date of the accident, and she responded, "I was driving a 2004 Ford Sport Trac." Ms. Garrett later discussed the money "*we* paid out" to fix the damage. The government asked Ms. May, "[W]hat type of car were you driving that day?" and she responded, "[a] Honda Accord." She later testified that she did not know exactly how many miles it had on it at the time of the accident and that "[m]y father used it for business before I had it."

The majority opinion cites to the indictment, but the charging document is not evidence. The majority opinion also states that "[Ms]. Garrett brought to court receipts" for the repairs she paid for, but the transcript reflects that these purported receipts were excluded from evidence.

vania Avenue. But 19th Street is a one-way, so the vehicles were traveling south on 19th Street. It's one way south. So all the vehicles were going down south. And they had the green light, where the Escalade traveled through the 19th Street intersection, causing—he struck two vehicles, causing an accident—causing an accident in that intersection.

When asked to specify precisely how the SUV had struck the cars in the intersection, Officer Ferretti testified that "from what [he could] remember, [he thought] [Mr. Vines's] vehicle hit the back of one car and the front of another." Officer Ferretti estimated that Mr. Vines "picked up speed" as he approached the intersection and was driving at approximately "35, 40 miles per hour" just before the accident.

Ms. Garrett and Ms. May corroborated that they were each hit by the SUV just after their light turned green and they drove into the same intersection at 19th Street and Pennsylvania Avenue, N.W. Ms. Garrett testified: "The light changed in the direction of which I was going. It changed to green, and I proceeded through the intersection, and a truck hit my truck." Ms. Garrett noted that there were other cars in the intersection, and that after the SUV hit her car, it continued forward and hit Ms. May's vehicle, which was immediately to Ms. Garrett's left. Ms. May similarly testified, "I was sitting still at a red light at the corner of 19th and Pennsylvania, and the light turned green. I hesitated a moment, pulled into the intersection, and was struck." The incident "took [her] by surprise" and she "didn't really see anything. [She] just pulled into the intersection, [and] felt an impact. . . ."

## II. Merger Analysis

At the outset of its merger discussion, the majority opinion correctly acknowledges that the Double Jeopardy Clause prohibits multiple punishments for the same offense. *Owens v. United States,* 497 A.2d 1086, 1095 (D.C.1985); *see also North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds by Alabama v. Smith,* 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). But the majority opinion quickly loses its way by announcing that Mr. Vines's two destruction of property convictions fall into two purported exceptions to that rule, without explaining the framework this court has established to determine if Double Jeopardy protections are implicated and merger is required.

The majority opinion's assertions notwithstanding, there is no categorical rule that, regardless of the particular offense charged, multiple punishments are permitted whenever a court can discern separate "victims." Instead, the place to begin when examining whether multiple punishments are permitted for a single offense are the elements of that offense. *See Ladner v. United States,* 358 U.S. 169, 173–76, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958) (to determine whether petitioner could be required to serve consecutive sentences for wounding two federal officers by firing a shotgun once in their direction, the Supreme Court examined the elements of assaulting a federal officer in the federal criminal code to determine whether the statute was drafted to protect individual federal officers); *cf. Owens,* 497 A.2d at 1095 (whether imposition of consecutive sentences for the same act violates the Double Jeopardy clause depends on the intent of the legislature). If the legislature has expressly defined the "unit of prosecution" in reference to individuals, *Ladner,* 358 U.S. at 173–76, 79 S.Ct. 209; *Speaks v. United States,* 959 A.2d 712, 716–17 (D.C.2008)—or, as the majority opinion posits in this case, individual prop-

erty interests—we allow punishment to be imposed on that basis.[3] *See Briscoe v. United States*, 528 A.2d 1243, 1245 (D.C. 1987) ("[W]e must determine whether the Council of the District of Columbia [or Congress] intended to permit multiple punishments" for the same activity "at the same time and at . . . the same place."). But if the legislature has not defined the "unit of prosecution" in reference to individuals, then the number of persons affected by the criminal conduct has no bearing on the number of sentences a person convicted of that offense may receive.[4]

**3.** *See, e.g., Speaks*, 959 A.2d at 716 (holding that one act that injured multiple children could sustain multiple convictions and consecutive sentences because the cruelty to children statute "was intended to protect individual victims"); *Ruffin v. United States*, 642 A.2d 1288, 1298 (D.C.1994) (holding that it was "beyond question" that the purpose of "the statutory crimes of murder and AWIK [assault with intent to kill]" is the protection of individuals, and thus "multiple convictions can arise from a single criminal act" if there are multiple victims); *Murray v. United States*, 358 A.2d 314, 320 (D.C.1976) (holding negligent homicide statute "unambiguously was designed to protect individual victims," and thus the trial court had the authority to impose consecutive one-year terms of imprisonment on two counts of negligent homicide arising from a single collision).

**4.** The majority opinion repeatedly cites *Hanna v. United States*, 666 A.2d 845 (D.C.1995), as authority for its proposition that merger is prohibited whenever more than one person is adversely affected by the defendant's criminal conduct, but the majority opinion's reading of *Hanna* is substantially off the mark. Preliminarily, had *Hanna* announced such a categorical rule, it should have precluded merger in recent decisions like *Kittle v. United States*, 09–CF–1586, 2013 WL 2102150, at *13 n. 15 (D.C. May 16, 2013) (merger of two counts of threats required where appellant's threat to kill "all y'all" was "one act directed at an undifferentiated group of victims"); *Hargraves v. United States*, 62 A.3d 107, 121 n. 50 (D.C.2013) (Fisher, J., joining the majority) (specifically noting that the fact "[t]hat the predicate offenses had different victims does not preclude merger on the facts of this case"); and *Hampleton v. United States*, 10 A.3d 137, 146 (D.C.2010) (Fisher, J.) (merging multiple convictions for possession of a firearm during the commission of a crime of violence that stemmed from the armed robbery of multiple victims).

That *Hanna* did not intend to announce a total prohibition on merger where multiple individuals are adversely affected by criminal conduct is also evident both from the cases that *Hanna* cited for this proposition and from the actual analysis of the merger issues presented in *Hanna*. The court in *Hanna* cited and "compare[d]" two cases: *Joiner v. United States*, 585 A.2d 176 (D.C.1991), and *Adams v. United States*, 466 A.2d 439 (D.C. 1983). *Hanna*, 666 A.2d at 855 & n. 13. In *Joiner*, the court held that the appellant's six counts of assault with a deadly weapon (ADW) merged when "he fired a single shot in the direction of the group of seven men" and thus committed only one punishable offense. 585 A.2d at 178. *Joiner* clearly does not support a blanket rule of no merger for "different victims." In *Adams*, the court held only that two different crimes (attempted robbery while armed and ADW) against two different victims did not merge. 466 A.2d at 443 n. 3. Not much more can be discerned because the opinion is short on facts identifying either who the different victims were or what the conduct was that was being charged as robbery while armed or ADW.

The resolution of the various merger issues in *Hanna* further demonstrates that it did not endorse a blanket separate-punishment-for-each-individual-affected rule. It declined to merge two assault charges—not on the basis that there were two separate victims, but rather on the ground that there "were two separate assaults," *i.e.*, two separate acts, "*not* a collective assault on the two victims." 666 A.2d at 855 n. 14 (emphasis added). And, following *Joiner*, the court in *Hanna* merged other ADW convictions that were based on a "collective assault." *Id.* at 857. The court also merged two counts of burglary based on the invasion of one apartment "because [the] societal interest protected by [the] burglary statute was offended only once." *Id.* at 856.

For all of these reasons, *Hanna* does not provide support for the majority opinion's analysis.

Moreover, in the absence of a clearly defined unit of prosecution with reference to individuals, we apply the doctrine of lenity and choose "the less harsh alternative." *Murray*, 358 A.2d at 320 (citing *Ladner*, 358 U.S. at 177–78, 79 S.Ct. 209). As this court acknowledged in *Murray*, 358 A.2d at 320, we are "guided by the principles of *Ladner*" in which the Supreme Court stated: " 'When [a] choice has to be made between two readings of what conduct [the legislature] has made a crime, it is appropriate ... to require that [the legislature] should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication.' " *Ladner*, 358 U.S. at 177–78, 79 S.Ct. 209 (brackets removed) (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22, 73 S.Ct. 227, 97 L.Ed. 260 (1952)).[5]

Thus, when the legislature has been anything less than "clear and definite," the only way multiple punishments may be imposed for the same offense without violating the Double Jeopardy Clause is if it is possible to identify temporally severable incidents of the same offense, a task performed using a fork-in-the-road or fresh-impulse test. If a fork in the road was presented or a fresh impulse was evident, then the defendant can be said to have acted twice and thus may be punished twice:

> Criminal acts are considered separable for purposes of merger analysis when there is "an appreciable period of time"

between the acts that constitute the two offenses, or when a subsequent criminal act "was not the result of the original impulse, but of a fresh one." In evaluating separability of offenses, this court has adopted the so-called "fork-in-the-road" test for determining whether a defendant's conduct is subject to multiple punishments....

*Hanna*, 666 A.2d at 853 (citations omitted) (quoting *Allen v. United States*, 580 A.2d 653, 658 (D.C.1990), and *Blockburger v. United States*, 284 U.S. 299, 303, 52 S.Ct. 180, 76 L.Ed. 306 (1932)).

Applying this framework to Mr. Vines's case, there is no legitimate basis for double punishment for destruction of property. One basis for the majority opinion's holding that double punishment is permitted is that Mr. Vines collided with two cars driven by two different people. The majority opinion asserts that D.C.Code § 22–303 "is generally defined by reference to the individual interests therein."[6] Were this in fact the case, some harsh consequences could result: If a defendant recklessly collided with a car jointly owned by a married couple, he could receive two sentences for that single act; if he collided with a moving van carrying the property of twenty different individuals and that property was damaged, he could receive twenty sentences for that single act. But the majority opinion reads an element into the statute that is not there.

At the time of this incident, D.C.Code § 22–303 (2001) made it a crime whenever

---

5. The Court in *Ladner* determined that Congress had not clearly defined then 18 U.S.C. § 2254 to protect individual federal officers, and noted that, "[i]f Congress desires to create multiple offenses from a single act affecting more than one federal officer, Congress can make that meaning clear." 358 U.S. at 178, 79 S.Ct. 209.

6. The majority opinion appears to assume that Ms. Garrett and Ms. May owned the cars

they were driving; in fact, there is no such testimony in the record. See *supra* note 2. If an individual's interest in property were an element of the offense so as to allow multiple punishments for every interest adversely affected, it is curious that the government never asked either Ms. Garrett or Ms. May the critical question, "Who owned the car you were driving?"

a person "maliciously injures . . . any public or private property . . . not his or her own, of the value of $200 or more."[7] The statute expresses no interest in individual property rights. As written, it does not matter whether one person or one hundred people have an interest in the injured "property." Instead, as the statute makes clear, the critical elements are that (1) the defendant has no interest in the property (which might give him the right to destroy or injure it if he so chose) and (2) the aggregate value of the damaged property must exceed $200.

The majority opinion concedes that the statute "by its terms" does "not require the government to prove who owned the affected property beyond proving that the defendant did not own it"; nevertheless, it asserts that the statute protects individual property rights. Looking to the "not his or her own" language, the majority opinion asserts that these possessive pronouns somehow "explicitly distinguish between individual interests" of property owners. But this language refers to the defendant and simply acknowledges that an individual charged under D.C.Code § 22-303 (2001) may be male or female.

To buttress its individual property rights interpretation of D.C.Code § 22-303, the majority opinion looks beyond the plain language, but none of the other authority the majority opinion cites supports its statutory interpretation, much less gives a " 'powerful indication of the legislative intent' that the offense be defined . . . [by] the property interests injured," as the majority opinion asserts.[8] The majority

opinion's reliance on a different code provision, D.C.Code § 22-3201 (2001) (penalizing theft), that—in contrast to D.C.Code § 22-303—refers to "property of another," actually undermines its position. As the Supreme Court has noted, " '[w]here [the legislature] includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion.' " *Keene Corp. v. United States*, 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) (alteration removed) (ellipsis in original) (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)). Here, the fact that the legislature has expressly protected individual property interests in another criminal statute but excluded specific language in the destruction of property statute should preclude any reading of "property" in D.C.Code § 22-303 and "property of another" in D.C.Code § 22-3201 *in pari materia*. See *Keene*, 508 U.S. at 208, 113 S.Ct. 2035 (noting that courts generally have a duty to "refrain from reading a phrase into the statute when [the legislature] has left it out").

Moreover, the majority opinion's citations to *Baker v. United States*, 891 A.2d 208 (D.C.2006), and *Jackson v. United States*, 819 A.2d 963 (D.C.2003), are inapposite. The issue in *Baker* was whether graffiti constituted "injury" to property, not whether individual interests in property were protected by the statute, 891 A.2d at 215–16; the issue in *Jackson* was whether a defendant could be convicted of destruction of property jointly owned by

7. Section 22-303 was amended in 2011 after Mr. Vines's conviction to change the threshold value for damaged property from $200 to $1000. *See* D.C.Code § 22-303 (Supp.2012). The remainder of the statute is unchanged.

8. When we used this language in *Speaks,* we were referring to language in the child endan-

germent statute that expressly identifies the victim of the conduct as the maltreated child. *See Speaks,* 959 A.2d at 716–17 (discussing D.C.Code § 22-1101). As discussed above, there is no corresponding language in D.C.Code § 22-303 identifying an individual victim for the crime of destruction of property.

him and his wife, not whether a defendant could be given as many punishments as individual property interests at stake, 819 A.2d at 967.

Lastly, the majority opinion's recitation of the Black's Law Dictionary general definition of "criminal damage to property" has no relevance to our task of interpreting the District's destruction of property statute.[9]

Not only is merger required under a plain language reading of the statute, we have two decisions from this court that contradict the majority opinion's individual-property-interest interpretation of D.C.Code § 22–303: *Carter*, 531 A.2d 956, and *Johnson*, 883 A.2d 135.

In *Carter*, this court considered whether merger was required under the destruction of property statute when, as here, the defendant had collided with more than one vehicle. The government conceded that merger of some of the counts was required "since the evidence established that only three collisions caused damage to five cars." *Id.* at 964. The court agreed that this was appropriate where the evidence established that appellant had (1) "turned left into a group of parked cars belonging to several police officers" and "smashed into a car owned by Officer Jeffrey Wilson, which in turn was shoved into another car

owned by Officer Tanya Blake"; then (2) "turned in a different direction and struck a stop sign, dragging it across the front of a [different] parked car"; and (3) finally "turned into Northeast Drive, ... [where] he collided head-on with a police cruiser," damaging both the cruiser and the car he was driving (which did not belong to him). *Id.* at 958. Subsequently in *Johnson*, another car collision case, the court held that *Carter* "controlled," and that merger of two counts of destruction of property was required in a case where a stolen car and a post office truck were damaged in a single collision. 883 A.2d at 144–45. Again, the government conceded that this was the correct result under D.C.Code § 22–303.

Merger would not have been possible in either *Carter* or *Johnson* had the court interpreted the destruction of property statute to protect individual property interests as the majority opinion does in this case. And tellingly, neither after *Carter* nor after *Johnson*, did the D.C. Council amend the destruction of property statute to make clear that this court had gotten it wrong and that the Council did intend to protect individual property rights. Thus, under our merger case law generally, and our decisions in *Carter* and *Johnson* in particular, merger is required on the record in this case.[10]

9. Indeed, the need to consult this dictionary definition to discern the meaning of the term "property," a term undefined in the statute but commonly used as a collective, suggests that the majority opinion is unable to discern the intent of the legislature in D.C.Code § 22–303 without turning to outside sources. But as explained above, if the majority opinion discerns any ambiguity in D.C.Code § 22–303, merger is required under the doctrine of lenity. *See Murray*, 358 A.2d at 320.

To be clear, I do not believe the statute is ambiguous; rather, in my view, the plain language of the statute clearly does not protect individual property rights. Thus, I do not rely on the rule of lenity in the first instance to conclude that merger is required.

10. The majority opinion relegates its discussion of *Johnson* and *Carter* to a footnote. Its discussion of both cases is confused and appears to undercut its interpretation of D.C.Code § 22–303. Specifically, the majority opinion indicates that whether the multiple counts of destruction of property in these cases merged turned on whether the damage to the various cars had occurred simultaneously. But as noted above, this should not matter if the statute protects individual property rights.

The majority opinion ignores this inconsistency in its logic and, looking to *Carter*, argues that Mr. Vines's case is controlled by the counts that did not merge, rather than by the counts that did. But unlike *Carter*, there is no

This record gets short shrift, however, as is evident from the majority opinion's determination that double punishment is also permitted because, using a fork-in-the-road type analysis, Mr. Vines committed two separate criminal acts by causing "two distinct collisions." Why the majority opinion reaches out to determine that there were two distinct collisions is a mystery—after all, if D.C Code § 22–303 protects individual property rights as the majority opinion asserts, then the timing of the collisions should have no bearing on whether Mr. Vines may receive double punishment. But in any event, no witness testified to that effect. Rather, the testimony from Officer Ferretti, Ms. Garrett, and Ms. May collectively established that Mr. Vines entered the intersection of 19th and Pennsylvania Avenue traveling approximately 35 to 40 miles per hour and hit, in quick succession, two cars moving south; there is nothing in their testimony to suggest that after Mr. Vines hit Ms. Garrett's car, he reached a fork in the road where he could have avoided hitting Ms. May's car, but chose to do so.

The majority opinion asserts that Officer Ferretti's testimony "does not do much to clarify the ambiguity in the record" but seemingly ignores the full narrative of Officer Ferretti's testimony, which makes clear that he saw Mr. Vines speed up and then run a red light, plowing into moving traffic that had the right of way.[11] Instead, the majority opinion relies on Ms. Garrett's testimony as a foundation for its determination that there were two distinct collisions. At most, Ms. Garrett clarified the order in which Mr. Vines hit the cars that she and Ms. May were driving; in so doing, Ms. Garrett also confirmed that she was in the intersection with Ms. May's car when Mr. Vines sped through the intersection and hit them, one right after the other. Even looking to Ms. Garrett's testimony, the record is devoid of any evidence that Mr. Vines's collision with the two cars in the intersection at the same time were separate events, each the result of its own fresh impulse.[12] In short, the record in this case *un*ambiguously compels merger of Mr. Vines's two convictions for destruction of property.

I do not disregard the extreme recklessness of Mr. Vines's decision to run a red light in downtown D.C. at rush hour, or the seriousness of the injuries he could

evidence in the record that Mr. Vines turned different directions or chose a new path in order to hit Ms. Garrett's and then Ms. May's car, which were both travelling through the same intersection at the same time. It is the majority opinion's reliance on *Carter* that is "misplaced."

11. The majority opinion focuses on Officer Ferretti's testimony regarding one question of minimal import: where Mr. Vines's SUV made contact with Ms. Garrett's and Ms. May's vehicles. Officer Ferretti was asked "[w]hat side of the vehicle struck what side of the vehicle" and he responded that "[f]rom what [he] remember[ed], [he] th[ought] [Mr. Vines's] vehicle hit the back of one car and the front of another." But his qualifiers on this tangential point in no way undermine his clear recollection regarding all other details of the accident.

12. Unlike *Wages v. United States*, 952 A.2d 952 (D.C.2008), which the majority opinion cites in support of its holding, Mr. Vines was not presented with an opportunity to avoid inflicting a second injury. The crime at issue in *Wages*, Possession of a Firearm during a Crime of Violence, was not clearly defined in relation to individual victims, and thus (like destruction of property, *see supra* ) permitted merger "even when the predicate crimes are perpetrated against different victims." *Id.* at 964. But the court determined that merger was not required because Mr. Wages had committed "distinct assaults": "After shooting [Mr.] Mohamed, [Mr. Wages] reached a 'fork in the road' where he could have chosen not to shoot and rob [Mr.] Ahmed. Instead, with a fresh impulse, [Mr. Wages] executed a new assault." *Id.*

have caused. He could have killed someone. And, had that happened, I expect he would have been charged with a crime like negligent homicide, which, because of how it is statutorily defined, would have permitted the court to impose punishment for each individual killed. See *supra* note 3. But thankfully no one was seriously injured,[13] and, as destruction of property is currently defined, Mr. Vines may only legitimately receive one sentence for the damage he inflicted to the vehicles driven by Ms. Garrett and Ms. May.

---

**13.** The government actually charged Mr. Vines with aggravated assault in connection to the injuries allegedly suffered by Ms. May, but because she apparently had inadequate documentation of the severity of these injuries, the jury acquitted Mr. Vines of aggravated assault and returned a guilty verdict of simple assault instead.